Present: Carrico, C.J., Lacy, Keenan, Koontz, Kinser and
Lemons, JJ., and Poff, S.J.


VIRGINIA COLLEGE BUILDING AUTHORITY

v.  Record No. 992099     OPINION BY JUSTICE DONALD W. LEMONS
                                    November 3, 2000
BARRY LYNN, ET AL.

           FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Randall G. Johnson, Judge

     The Virginia College Building Authority ("VCBA" or

"Authority") approved the issuance of revenue bonds,

colloquially referred to as "conduit bonds," for the benefit

of Regent University ("Regent").  The funds to be raised by

the bonds were designated to finance projects at a new campus

in Alexandria and for refinancing of student housing on the

Virginia Beach campus.  Pursuant to the Public Finance Act of

1991, Code §§ 15.2-2600 to -2663, the VCBA filed a motion for

judgment in the Circuit Court for the City of Richmond

requesting validation of the bonds.

     Appellees, Barry Lynn and other unnamed Virginia members

of Americans United for Separation of Church and State, and

Frank Feibelman, Mary Bauer, and Bernard H. Levin appeared and

filed grounds of defense contesting the validation of the

bonds.  At the time of the circuit court hearing, VCBA had

completed approximately thirty-five bond issues for private

colleges or universities in the Commonwealth of Virginia.

After hearing evidence, the circuit court refused to validate the bonds, holding that Regent is ineligible to participate in the VCBA program because Regent is a pervasively sectarian institution and because its primary purpose is "religious training." In this appeal, we consider the circuit court's denial of Regent University's participation in bond financing of these projects pursuant to the Educational Facilities Authority Act, Code § 23-30.39 et seq. (the "Act").

## I.  FACTS

### A.  REGENT UNIVERSITY

Regent University is self-described as a "private Christian university" with a main campus located in Virginia Beach, Virginia. Regent offers more than 20 graduate degrees through eight accredited colleges, including the College of Communication and the Arts, School of Counseling and Human Services, School of Government, School of Business, School of Education, School of Law, School of Divinity, and the Center for Leadership Studies.[1] Regent is accredited by the Southern

---

[1] Regent offers the following graduate degrees: M.A. in Organizational Leadership, Ph.D. in Organizational Leadership, M.A. in Communication, M.A. in Journalism, M.A. in Script and Screenwriting, Ph.D. in Communication, M.A. in Counseling, Doctor of Psychology, M.A. in Biblical Studies, M.A. in Missiology, M.A. in Practical Theology, Master of Divinity in Missiology, Master of Divinity in Practical Theology, Doctor of Ministry, Master of Education, Certificate of Advanced

Association of Colleges and Schools ("SACS") and its Law School is separately accredited by the American Bar Association ("ABA").

Regent was founded upon Dr. M.G. ("Pat") Robertson's "inspired vision of establishing a graduate-level institution that would train mature men and women for the challenge of representing Christ in their professions." It was "incorporated . . . to recover the Christian heritage of our nation." Regent's "ultimate purpose" is to "glorify[] God and His Son, Jesus Christ."

Regent was created under the auspices of the Christian Broadcasting Network, Inc. ("CBN"), the Board of Directors of which still appoints the chairman and all 48 members of the University's Board of Regents. Three members of Regent's board are also members of CBN's board. Characterized as a "parachurch organization" with a "Christian purpose," CBN is to own all assets and incur all debts in the event of the dissolution of Regent. Regent has received over $200 million in financial support from CBN. As the founder and president of CBN, and the Chancellor of Regent, Robertson acts as "the principal liaison" between CBN and Regent. He consults with Regent "on such matters as the mission of the university, its

_____

Graduate Studies, M.A. in Public Policy, M.A. in Political Management, Master of Public Administration, and Juris Doctor.

scope and its direction," and provides guidance on and coordinates matters such as Regent's fiscal expenditures and general resource development.

Regent's Articles of Incorporation, provide that:

> [Regent] shall exist for the purpose of bringing glory to God and His Son Jesus Christ by providing an institution or institutions of learning in which those who are mature in the knowledge of God and His ways can assist and guide, in a spirit of free inquiry and scholarly excellence, those who would learn of Him, His ways, and His creation, while together they study ways to glorify God and better their world.

Regent has adopted a Statement of Faith that provides:

> Regent University is a Christ-centered institution. The Board of Trustees, along with the faculty and staff of the university, are committed to an evangelical interpretation and application of the Christian faith. The campus community is closely identified with the present-day renewal movement, which emphasizes the gifts, fruit and ministries of the Holy Spirit. It is expected that all trustees, officers, administrators and faculty will subscribe to this statement in writing:
>
> 1. That the Holy Bible is the inspired, infallible and authoritative source of Christian doctrine and precept.
> 2. That there is one God, eternally existent in three persons: Father, Son and Holy Ghost.
> 3. That man was created in the image of God but, as a result of sin, is lost and powerless to save himself.
> 4. That the only hope for man is to believe on the Lord Jesus Christ, the virgin-born son of God, who died to take upon Himself the punishment for the sin of

4

mankind, and who rose from the dead, so that by receiving Him as Savior and Lord, man is redeemed by His blood.

5. That Jesus Christ will personally return to earth in power and glory.

6. That the Holy Spirit indwells those who receive Christ, for the purpose of enabling them to live righteous and holy lives.

7. That the Church is the Body of Christ and is comprised of all those who through belief in Christ have been spiritually regenerated by the indwelling Holy Spirit. The mission of the Church is worldwide evangelization and the nurturing and discipling of Christians.

Additionally, Regent has adopted a Mission Statement that provides:

Preamble — Regent University is a graduate institution that exists to bring glory to God the Father and His Son Jesus Christ through the work of the Holy Spirit. Mission — Our mission is to provide an exemplary graduate education from biblical perspectives to aspiring servant leaders in pivotal professions and to be a leading center of Christian thought and action. Vision — Our vision, through our graduates and other scholarly activities, is to provide Christian leadership in transforming society by affirming and teaching principles of truth, justice and love as described in the Holy Scriptures, embodied in the person of Jesus Christ, and enabled through the power of the Holy Spirit.

Regent Provost Dr. William George Selig ("Dr. Selig") testified that the practical function of these statements is to:

> [S]et[] the stage of [Regent's] world view, that we exist to bring glory to God.  And that's our preamble.  But our mission, which is played out in very practical terms, is to provide an exemplary graduate education.  In other words, the finest possible education we can provide from [a] biblical perspective to people we hope will go on and make a difference in society.

Apart from the School of Divinity which has a specific purpose of theological education, instruction in other schools focuses upon traditional subjects with inclusion of biblical perspective where applicable.  As Dr. Selig explained: "In areas where [scripture] doesn't fit, we don't use it or we don't spend any time talking about it.  In areas where it fits, we do.  And so it's just a consistency in our world view as to how we behave toward others and what does scripture have to say."

Regent has approximately 108 faculty members and 1,850 students, 289 of whom are enrolled in the School of Divinity. The average age of a Regent student is 31.  Regent has no specific religious requirement for student admissions.  Its admissions criteria include: (1) high intellectual achievement and scholarship, with a minimum grade point average and test scores, (2) "maturity in spiritual and/or character qualities," and (3) "[p]ersonal goals consistent with the mission and goals of Regent University."

6

Dr. Selig explained that although some schools at Regent inquire into "Christian commitment" for the purpose of evaluating ethical or moral standards, the lack of such a "commitment" does not negatively impact an applicant's standing for admission. All applicants are required to submit a "Clergy Recommendation," both as a matter of policy and practice. Among the questions asked is whether the applicant has "made a meaningful personal commitment to Jesus Christ." Dr. Selig explained the relevance of this information as follows:

> Well, we're looking for moral and ethical standards, and we believe that if somebody is — and it's certainly, not 100 percent assured — but if somebody has made a — has made a Christian commitment, then we're assuming that they're attempting to live according to the tenets of scripture. So we see that as one piece of information that would be helpful.

Applicants also must submit a signed "Community Life Form," stating that they must "understand and be committed to receiving an education" in accordance with Regent's Statement of Faith.

Although encouraged to do so, students are not required to attend Regent's weekly corporate chapel services or participate in any particular religious activities. However, they must have "[p]ersonal goals consistent with the mission and goals of Regent University," and must submit a "[p]ersonal

7

goals statement" addressing how their "personal and spiritual objectives" relate to Regent's "Christ-centered educational philosophy." The instructions explain that "for the Christian, [a goal] is a statement of faith in God's will for his or her life."

Faculty, unlike students, are required to sign a document indicating their adherence to the "Statement of Faith." They are "strongly encouraged but they're not required" to attend chapel. The faculty is required to integrate "faith and learning." Dr. Selig testified, and the SACS and the ABA agree, that the Statement of Faith has not interfered with academic freedom. Regent's detailed academic freedom policy encourages faculty to "pursue truth . . . by research, discussion, and other forms of inquiry." Nonetheless, Regent prohibits faculty from using "their position or classroom as a platform to demand adherence by students to a personal theological viewpoint, political preference or social agenda." The SACS in a review of Regent's accreditation application in 1998 found that "[f]aculty and students are free to examine all pertinent data, question assumptions, be guided by the evidence of scholarly research, and teach and study the substance of a given discipline." With respect to its curriculum, each faculty member at Regent is required to include in the syllabus for each class a "description of how

the Christian faith and the Bible will be incorporated into the course."

## B. THE BONDS

Article VIII, § 11 of the Constitution of Virginia provides that:

> The General Assembly may provide for loans to, and grants to or on behalf of, students attending nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education. The General Assembly may also provide for a State agency or authority to assist in borrowing money for construction of educational facilities at such institutions, provided that the Commonwealth shall not be liable for any debt created by such borrowing. The General Assembly may also provide for the Commonwealth or any political subdivision thereof to contract with such institutions for the provision of educational or other related services.

Pursuant to this constitutional authorization, the General Assembly of Virginia enacted the "Educational Facilities Authority Act." The General Assembly declared in Code § 23-30.39 the public policy of the Commonwealth of Virginia as follows:

> It is hereby declared that for the benefit of the people of the Commonwealth, the increase of their commerce, welfare and prosperity and the improvement of their health and living conditions it is essential that this and future generations of youth be given the fullest opportunity

9

to learn and to develop their intellectual and mental capacities; that it is essential that institutions for higher education within the Commonwealth be provided with appropriate additional means to assist such youth in achieving the required levels of learning and development of their intellectual and mental capacities; and that it is the purpose of this chapter to provide a measure of assistance and an alternative method to enable institutions for higher education in the Commonwealth to provide the facilities and structures which are sorely needed to accomplish the purposes of this chapter, all to the public benefit and good, to the extent and manner provided herein.

To carry out the purposes of the Educational Facilities Authority Act, an agency of the Commonwealth entitled the "Virginia College Building Authority" was created. Among its powers and duties, the Authority may "issue bonds, bond anticipation notes and other obligations of the Authority for any of its corporate purposes." Code § 23-30.42(b). A "project" authorized for participation under the Act is defined in pertinent part as follows:

"Project," in the case of a participating institution for higher education, a structure or structures suitable for use as a dormitory or other multi-unit housing facility for students, faculty, officers or employees, a dining hall, student union, administration building, academic building, library, laboratory, research facility, classroom, athletic facility, health care facility, maintenance, storage or utility facility and other structures or facilities related to any of the foregoing or required or useful for the instruction of students

10

> or the conducting of research or the operation of an institution for higher education, . . . and shall not include any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination.

Code § 23-30.41(b). Specifically, an "[i]nstitution for higher education" is defined as "[a] nonprofit educational institution within the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education." Code § 23-30.41(e).

Generally speaking, the VCBA issues bonds that enjoy income tax exemption under United States Internal Revenue Code §§ 103, 145 and, for Virginia residents, Code § 23-30.53. The proceeds of bonds issued are loaned to the qualified institution of higher education (hence the descriptive term, "conduit") and repayment to bond holders is made through a trustee who monitors the institution's payments, credit-worthiness, and compliance with terms of the loan. After issuance of the bonds, the VCBA has no active role. The qualified institution of higher education pays all costs associated with the issuance of the bonds. No state funds are granted or loaned, and:

> Revenue bonds issued under the provisions of this chapter shall not be deemed to constitute a debt or liability of the Commonwealth or of any political subdivision thereof or a pledge of the faith and credit of the Commonwealth or of any political subdivision, but shall be payable solely from the funds herein provided therefor from revenues. . . . The issuance of revenue bonds under the provisions of this chapter shall not directly or indirectly or contingently obligate the Commonwealth or any political subdivision thereof to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment.

Code § 23-30.49.

Upon Regent's application for participation under the Educational Facilities Authority Act, the VCBA on June 22, 1999 adopted a resolution approving bonds for the benefit of Regent for projects including a new campus in Alexandria containing classrooms, administrative space, a communication and arts complex, an events center on the Virginia Beach campus, and refinancing of student housing in Virginia Beach previously financed with tax exempt bonds. Specifically, the VCBA Resolution mandates that no bond proceeds will be used to provide:

> (a) any facility used or to be used for sectarian instruction or as a place of religious worship, including any chapel and the like or (b) any facility used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination;

12

and in particular the proceeds of the Bonds will not be used to provide facilities for the University's Divinity School.

In its application Regent proposed that it would make a pro-rata equity contribution for the use of that portion of the Alexandria building subject to the financing by bonds, in order to compensate for use of the facilities by the School of Divinity.  Additionally, in testimony, Dr. Selig indicated that Regent "would lease space out elsewhere" and not use the bond-financed facilities for the School of Divinity if the pro-rata equity contribution proposal was not approved.

## II.   STANDARD OF REVIEW

At the trial of this matter, both parties submitted exhibits to be considered by the court; however, only VCBA offered testimony.  The trial judge ruled from the bench immediately upon the conclusion of the presentation of evidence and arguments of counsel.  Thereafter, counsel for appellee submitted a proposed order, 17 pages in length, containing detailed findings of fact and conclusions of law. The trial judge declined to enter the proposed order saying:

> I didn't disbelieve any witness who was on the stand.  I just had a different interpretation of the facts than those witnesses had of the facts.  I mean to the extent that it helps you at all, my decision was not based on any credibility findings with regard to the witnesses.  It was based solely on the record.  And the

13

> [appellate] Courts will have exactly the same record that [I] have. I really don't see why I have to make findings of fact and conclusions of law.
>
> ****
>
> . . . why does the Supreme Court of Virginia or the Supreme Court of the United States need to know how I interpreted the law? What difference does it make to them how I interpreted the law?

Considering the observations of the trial judge and upon our examination of the record, we conclude that "[w]hile the parties disagree as to the conclusions to be drawn from the factual record, the facts themselves are not in dispute." Smyth County Community Hosp. v. Town of Marion, 259 Va. 328, 331, 527 S.E.2d 401, 402 (2000).

The determination of Regent's eligibility for participation under the Educational Facilities Authority Act is a mixed question of law and fact. Therefore, we conduct a review of the trial court's application of law to the undisputed facts. Cinnamon v. Int'l Bus. Machines Corp., 238 Va. 471, 474, 384 S.E.2d 618, 619 (1989).

### III. ISSUES PRESENTED

VCBA contends that the trial court erred in denying validation of the bonds for the benefit of Regent. It maintains that extension of the benefits offered under the Act to Regent would not violate the Constitution of Virginia or

14

Virginia statutory provisions, nor would it violate the Establishment Clause of the First Amendment to the United States Constitution. VCBA asserts that its program of bond financing involves aid provided in a neutral fashion to eligible institutions of higher education in the Commonwealth. Further, VCBA maintains that Regent is not a pervasively sectarian institution and that even if it is pervasively sectarian, this form of aid is, nonetheless, permissible. Additionally, VCBA contends that refusal of validation of the bonds for the stated reasons amounts to discrimination based upon the recipient's viewpoint, which is prohibited by the free speech clauses of the United States Constitution and the Constitution of Virginia.

Appellees urge this Court to uphold the circuit court's denial of validation of the bonds because they contend that Regent is pervasively sectarian and its participation in state-sponsored bond financing is impermissible under the Constitution of Virginia and statutes and violates the Establishment Clause of the First Amendment to the United States Constitution. At the very least, appellees maintain that the Regent School of Divinity should not be permitted to utilize any space in buildings financed by the bonds. Finally, appellees assert that denial of validation does not implicate free speech issues.

15

The posture of this case requires our consideration of the issues in a precise order. We must first consider whether the validation of the bonds would violate the Act or the provisions of Article VIII, § 11 of the Constitution of Virginia. Second, we must consider whether the Establishment Clause of the First Amendment to the United States Constitution and/or Article I, § 16 of the Constitution of Virginia would be violated if the bonds were validated. Only if we determine that a violation of the Act or the various provisions of the Constitution of Virginia has occurred do we consider the question of violation of free speech rights based upon viewpoint discrimination.

IV.  ANALYSIS OF STATE ISSUES

Both the Act and Article VIII, § 11 of the Constitution of Virginia state that aid is permitted to institutions "whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education." Va. Const. art. VIII, § 11, Code § 23-30.41(e). In addition to finding that Regent was pervasively sectarian, the trial court held that it could not validate the bonds because Regent had "a primary purpose of religious training," which would violate the Act and Virginia constitutional provisions. Appellees candidly concede that, apart from particular concerns about the School of Divinity, they do not

16

contend that Regent is such an institution.  In their brief appellees state:

> Although the trial court found otherwise, the Appellees did not contend in the court below and do not contend here, that Regent is such an institution.  The Appellees' only contention that involves Article VIII, § 11 pertains to Regent's proposal of a pro rata contribution to compensate for the Divinity School's use of the bond-financed buildings.  Accordingly, the general question of whether the bonds can be issued turns on whether the issuance would violate the federal Establishment Clause and the parallel provision of the Virginia Constitution, Article I, § 16.

Despite appellees' concession, the trial court, nonetheless, made these findings and we must review them.[2]

As more fully developed in this opinion, we find that Regent, in both policy and practice, is pervasively sectarian.  However, this conclusion does not resolve the question of its primary purpose.  In order to validate the bond issue, state constitutional and statutory provisions require that Regent must be an institution whose "primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education."  With the exception of the

---

[2] By contrast, the trial court did not address and the parties did not argue in the court below or before us that use of the proposed facilities would involve "sectarian instruction" contrary to the Act (§ 23-30.41(b)) and the Resolution.  Accordingly, we do not address this issue.

17

Divinity School, we are satisfied that Regent meets this requirement.

Definition of the phrase "religious training or theological education" must precede our analysis of primary purpose.  The Report of the Commission on Constitutional Revisions ("Report") observed that "a theological seminary would not qualify" for inclusion but stated that among "those colleges and universities which would qualify, the section makes no distinction between those which are church-related and those which are not.  Many of the private colleges in Virginia are church-related, but typically they operate like any other college." Report of the Commission on Constitutional Revision, 1969, p. 274.

Of particular help in our interpretation of the meaning of the phrase "religious training or theological education" is the Report's reference to Public Views Document 100 which is a "Memorandum to Commission on Constitutional Revision" from the Association of Independent Colleges.  The Report specifically cites to that portion of the Memorandum which states:

> The Association does not advocate state aid for the promotion of theological training or religious education.  Clearly, a seminary and its students should be barred from state aid.  Under the federal Higher Education Facilities Act of 1963 a distinction is made between a church related college and an institution or one of its departments whose primary function

18

is educating students for religious vocations.  See 20 U.S.C.A. § 751(a)(2). This distinction is the difference between an institution whose primary service is to the state and community and one whose primary service is to a religious or denominational group. (emphasis supplied).

Public Views Document 100, p. 6.

Based on the language in this document and the Report of the Commission on Constitutional Revision, we interpret the phrase "theological education" to be applicable to a seminary or other institution whose purpose is to prepare students for vocations associated with ordination, such as rabbi, minister or priest.  By contrast, we interpret the phrase "religious training" to be applicable to institutions or departments within institutions whose purpose is preparation of students for religious vocations other than those associated with ordination.  Such other vocations would include missionary or director of religious education.  In either case, the "primary function is educating students for religious vocations."[3]

---

[3] At the conclusion of Public Views Document 100, the Association of Independent Colleges proposed adoption of the specific language which was incorporated into the Act and Art. VIII, § 11 of the Constitution of Virginia utilizing the phrase "religious training or theological education."  Id. at 13.  We are mindful that Public Views Document 100 also utilized the phrase "religious education or theological training" in the body of its memorandum.  Id. at 6.  We are persuaded that the interchangeable usage of "training" and "education" in the memorandum does not detract from the interpretation of the phrases in the Act and the Constitution.

19

With the exception of the School of Divinity, the primary purpose of Regent's graduate programs is preparing students for secular vocations.  Although an institution may have multiple purposes, by definition it can have only one "primary purpose."  Webster's Third New International Dictionary (1993) defines "primary" as "first in order of time or development."  Id. at 1800.

Regent offers over 20 different graduate degrees in subjects such as business, education, journalism, law, and psychology.  Regent is accredited by the SACS to award the master's and doctor's degrees.  In reaffirming Regent's accreditation, SACS noted that:

> Regent University demonstrates a well-documented concern for promoting and assuring academic freedom and providing for professional security of faculty members.  The faculty want to integrate faith into learning, but no one attempts to dictate to them how this is to be done.
>
> ****
>
> Faculty and students are free to examine all pertinent data, question assumptions, be guided by the evidence of scholarly research, and teach and study the substance of a given discipline.  All the units seem very open to and supportive of academic freedom, viewing it, as one unit explains, as a "sacred trust."

The ABA accredited the law school and such accreditation permits its graduates to apply for licensure to practice law

in all 50 states.  The ABA also found no inhibition of Regent's academic freedom.

The law school at Regent provides a good illustration of Regent's primary purpose.  First year students are required to take courses in Common Law, Contracts, Torts, Civil Procedure, Legal Research and Writing, and Property.  Students are exposed to the same core curriculum that permeates the first year at any law school in the country.

Regent may have an idealized mission of "glorifying God and His Son, Jesus Christ."  However, this precatory language does not reveal the primary institutional purpose.  In all practical aspects, Regent is a graduate institution that teaches various secular subjects from a religious viewpoint.  The prohibition in question under the Act and the Constitution of Virginia does not proscribe teaching of otherwise secular subjects from a religious viewpoint.

We hold that, with the exception of the Divinity School, Regent is an institution "whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education."[4]

---

[4] The fact that the nonclinical M.A. degree in the School of Counseling is designed to train students to work in a church/ministry setting does not transform that particular school into one whose "primary purpose" is religious training. This degree program is only one of several in that department, and it must be viewed in that context along with the various

21

In addition to particular concerns about use of the bond-funded facilities by the School of Divinity[5], appellees maintain that Article I, § 16 of the Constitution of Virginia, which they refer to as a "parallel provision" to the federal Establishment Clause, is violated and that our prior holding in Habel v. Indus. Dev. Auth., 241 Va. 96, 400 S.E.2d 516 (1991) (Liberty University is pervasively sectarian and its participation in industrial bond financing violates the Establishment Clause and Article I, § 16 of the Constitution of Virginia) must be applied to invalidate the conduit bonds proposed to be issued to Regent. Appellees are correct to characterize Article I, § 16 of the Constitution of Virginia as a "parallel provision" to the Establishment Clause for we have always been informed by the United States Supreme Court Establishment Clause jurisprudence in our construction of Article I, § 16.

Because the Establishment Clause landscape is ever-changing, we have not hesitated to reconsider prior interpretation of our own Constitution. We noted in Miller v. Ayres, 214 Va. 171, 198 S.E.2d 634 (1973)("Miller II"), that the United States Supreme Court had decided ten cases involving state programs of financial aid to private

_____

course offerings in order to determine the primary purpose of the School of Counseling.

22

educational institutions since Miller v. Ayres, 213 Va. 251, 191 S.E.2d 261 (1972) ("Miller I").  See Miller II, 214 Va. at 180, 198 S.E.2d at 641.  We stated without hesitation, "[t]hese new decisions require a reexamination of our earlier holding."  Id.  Similarly, the multitude of Establishment Clause cases decided by the United States Supreme Court since Habel require reexamination of that prior holding.  As our analysis of current Establishment Clause requirements reveals, Regent's participation in the VCBA bond program does not violate the Establishment Clause and similarly does not violate Article I, § 16 of the Constitution of Virginia.

V.   ESTABLISHMENT CLAUSE[6]

A.   THE STANDARD

In its most recent pronouncement on the subject, the United States Supreme Court once again acknowledged the uncertain and ever-changing landscape of its Establishment Clause jurisprudence.

> The Establishment Clause of the First Amendment dictates that "Congress shall make no law respecting an establishment of religion." In the over 50 years since Everson [v. Bd. of Educ. of the Township of Ewing, et al., 330 U.S. 1 (1947)], we have consistently struggled to apply these

---

[5] These concerns are separately addressed herein.

[6] Our Establishment Clause analysis does not include consideration of proposed bond financing of facilities to be used by the School of Divinity.  This question is analyzed separately herein.

23

> simple words in the context of governmental aid to religious schools.  As we admitted in Tilton v. Richardson, 403 U.S. 672, 29 L.Ed.2d 790, 91 S.Ct. 2091 (1971), "candor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area." 403 U.S. at 678 (plurality opinion); see 403 U.S. at 671 (White, J., concurring in judgment).

Mitchell v. Helms, ___ U.S. ___, 120 S.Ct. 2530, 2540 (2000) (plurality opinion).

Review of the entire panoply of Establishment Clause cases is often unhelpful in a particular case because adjudication of these sensitive issues is dependent upon the context in which they are raised.  Chief Justice Burger's observations for the Court in Walz v. Tax Comm'n, 397 U.S. 664 (1970), remain true today:

> The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution.  The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute.  In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis.  The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles.

24

Id. at 668.

In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Court recited its well known three-pronged test for Establishment Clause analysis: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.' "  Id. at 612-13 (citations omitted).  Thereafter, in Agostini v. Felton, 521 U.S. 203 (1997), the Court reaffirmed the general principles used to determine whether government aid violates the Establishment Clause.  After Agostini, the analysis still requires determination "whether the government acted with the purpose of advancing or inhibiting religion" and "whether the aid has the 'effect' of advancing or inhibiting religion."  Id. at 222-23.  Merging the analysis of excessive government entanglement into the "primary effect" analysis, the Court stated:

> Regardless of how we have characterized the issue, however, the factors we use to assess whether an entanglement is "excessive" are similar to the factors we used to examine "effect." That is, to assess entanglement, we have looked to "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority."

25

Id. at 232 (quoting Lemon, 403 U.S. at 615).

Recent cases rarely involve claims of governmental action purposefully advancing religion; consequently, after Agostini, the focus of Establishment Clause analysis will most often be upon the "primary effect" test. In that regard, the Court articulated three criteria used to determine whether government aid is permissible: "it does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." Id. at 234. Finally, Agostini requires a determination whether the government aid constitutes an "endorsement of religion." Agostini, 521 U.S. at 235. See also Mitchell, ___ U.S. at ___, 120 S.Ct. at 2560 (O'Connor, J., concurring).

Agostini overruled a prior decision in Aguilar v. Felton, 473 U.S. 402 (1985), involving not only the same government program (Title I of the Elementary and Secondary Education Act of 1965), but involving the same case which it revisited some years later upon petition seeking relief from an injunction pursuant to Federal Rule 60(b)(5). The Court in Aguilar characterized the schools receiving aid as "pervasively sectarian." Id. at 411-12. Upon reconsideration of the case, the Court focused upon the character of the aid involved and whether "use of that aid to indoctrinate religion could be

attributed to the State." Agostini, 521 U.S. at 230.
Declaring that "we have departed from the rule . . . that all government aid that directly assists the educational function of religious schools is invalid," id. at 225, the Court acknowledged that government aid to pervasively sectarian schools had been previously approved:

> [W]e have sustained programs that provided aid to all eligible children regardless of where they attended school. See, e.g., Everson v. Board of Ed. of Ewing, 330 U.S. 1, 16-18 (1947)(sustaining local ordinance authorizing all parents to deduct from their state tax returns the costs of transporting their children to school on public buses); Board of Ed. of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 243-244 (1968)(sustaining New York law loaning secular textbooks to all children); Mueller v. Allen, 463 U.S. 388, 398-399 (1983)(sustaining Minnesota statute allowing all parents to deduct actual costs of tuition, textbooks, and transportation from state tax returns); Witters [v. Washington Dept. of Servs. for Blind, 474 U.S. 481, 487-88 (1986)](sustaining Washington law granting all eligible blind persons vocational assistance); Zobrest [v. Catalina Foothills Sch. Dist., 509 U.S. 1, 10 (1993)] (sustaining section of IDEA providing all "disabled" children with necessary aid).

Id. at 231. Of course in Agostini, the Court approved aid to pervasively sectarian schools by permitting public school teachers to provide remedial education to disadvantaged children in parochial schools.

27

Upon cursory review, it would appear that _Agostini_ removed from consideration the analysis of the pervasively sectarian nature of the institution receiving government aid. The plurality in _Mitchell_ certainly thought so when it said:

> One of the dissent's factors deserves special mention: whether a school that receives aid (or whose students receive aid) is pervasively sectarian. The dissent is correct that there was a period when this factor mattered, particularly if the pervasively sectarian school was a primary or secondary school. But that period is one that the Court should regret, and it is thankfully long past.

_Mitchell_, ___ U.S. at ___, 120 S.Ct. at 2550. However, without a fifth vote to command a majority, the plurality's obituary for analysis of pervasive sectarianism may be premature. The concurrence of Justice O'Connor, joined by Justice Breyer, suggests that the consideration of an institution's pervasively sectarian nature, although limited in impact, remains appropriate.

_Mitchell_ involved a challenge to a school aid program described as a "close cousin" to the provision at issue in _Agostini_. ___ U.S. at ___, 120 S.Ct. at 2537. Chapter 2 of the Education Consolidation and Improvement Act of 1981, Pub. L. 97-35, 95 Stat. 469, as amended, 20 U.S.C. §§ 7301-7373, among other things, provides aid for certain instructional and educational materials. _Mitchell_, ___ U.S. at ___, 120 S.Ct.

28

at 2537. Federal funds are provided to state and local educational agencies which, upon application from both public and private schools, purchases requested materials and loans them to the requesting institution. Id. at ___, 120 S.Ct. at 2537. In Jefferson Parish, Louisiana, private schools, including religious schools characterized by the district court as pervasively sectarian, participated in the program of government aid. See id. at ___, 120 S.Ct. at 2538.

In Mitchell a majority of six justices approved aid to schools that are indisputably pervasively sectarian. The plurality opinion reaffirmed the Agostini refinement to the Lemon test and, because the secular purpose of the program and any excessive government entanglement were not the subject of controversy, focused entirely upon the two remaining criteria of the Agostini "effect" test: whether the program results in governmental indoctrination, and whether it defines its recipients by reference to religion.

Concluding that the aid did not have "the effect of advancing religion," the plurality stated, "[the aid] does not result in governmental indoctrination, because it determines eligibility for aid neutrally, allocates that aid based on the private choices of the parents of schoolchildren, and does not provide aid that has an impermissible content. Nor does [the program] define its recipients by reference to religion." Id.

at \_\_\_, 120 S.Ct. at 2552.  For the plurality, "the inquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive."  Id. at \_\_\_, 120 S.Ct. at 2551.

Justice O'Connor, the author of the majority opinion in Agostini, concurred in the result of Mitchell but wrote separately because the plurality opinion was "of unprecedented breadth for the evaluation of Establishment Clause challenges to government school-aid programs."  Id. at \_\_\_, 120 S.Ct. at 2556 (O'Connor, J., concurring).  Summarizing her concerns with the plurality, Justice O'Connor stated:

> Reduced to its essentials, the plurality's rule states that government aid to religious schools does not have the effect of advancing religion so long as the aid is offered on a neutral basis and the aid is secular in content.  The plurality also rejects the distinction between direct and indirect aid, and holds that the actual diversion of secular aid by a religious school to the advancement of its religious mission is permissible.

Id.

Noting the importance of neutrality, private choices, and secular content, Justice O'Connor emphasized that other factors must be considered in the evaluation of school aid programs.  These factors include whether the aid is supplemental to regular curricula, whether state funds reach

religious school's coffers, whether the aid is actually diverted to religious activities, and whether the aid constitutes an endorsement of religion.

Although never directly responding to the plurality's announcement of the death of "pervasively sectarian analysis," the concurring opinion makes it clear that such concerns are still alive. Justice O'Connor states:

> I also disagree with the plurality's conclusion that actual diversion of government aid to religious indoctrination is consistent with the Establishment Clause. . . . [O]ur decisions "provide no precedent for the use of public funds to finance religious activities." . . . [A]ctual diversion is constitutionally impermissible.

Id. at ___, 120 S.Ct. at 2558 (citations omitted).

In the context of her concerns over actual diversion of government aid to religious activity, Justice O'Connor favorably cites Justice Kennedy's concurring opinion in Bowen v. Kendrick, 487 U.S. 589 (1988), where the remand to the district court is explained as follows: "The only purpose of further inquiring whether any particular grantee institution is pervasively sectarian is as a preliminary step to demonstrating that the funds are in fact being used to further religion." Mitchell, ___ U.S. at ___, 120 S.Ct. at 2558 (O'Connor, J., concurring)(citing Bowen, 487 U.S. at 624 (Kennedy, J., concurring)).

31

Clearly, the United States Supreme Court has approved some forms of aid to pervasively sectarian institutions. See, e.g., Mitchell, ___ U.S. ___, 120 S.Ct. 2556 (upholding funds distributed by the federal government to state and local governmental agencies, which in turn lend educational materials and equipment to public and private schools, including parochial schools), Agostini, 521 U.S. at 234-35 (upholding a federally funded program providing supplemental, remedial instruction by public school teachers to disadvantaged children in parochial schools), Zobrest, 509 U.S. at 10 (upholding a state-funded sign-language interpreter being furnished to a disabled child enrolled in a pervasively sectarian school), Witters, 474 U.S. at 488-89 (sustaining Washington law granting all eligible blind persons vocational assistance and permitting use of grant money for program at a Bible college), Mueller, 463 U.S. at 398-99 (sustaining Minnesota statute allowing all parents to deduct actual costs of tuition, textbooks, and transportation from state tax return, including expenses associated with their children's attendance at parochial schools), Allen, 392 U.S. at 243-44 (sustaining New York law loaning secular textbooks to all children, including children at parochial schools), and Everson, 330 U.S. at 16-18 (sustaining local ordinance authorizing all parents to deduct on their state tax returns

32

the costs of transporting their children to public or private schools on public buses).

The governmental aid in Mitchell, Agostini, Zobrest, Witters, Mueller, Allen and Everson involved pervasively sectarian schools.  In these cases, it was the nature of the aid that was dispositive of the Establishment Clause question, not the nature of the institution.  Upon consideration of Agostini, the plurality and concurring opinions in Mitchell, and the several cases cited above, we conclude that both the nature of the aid and the nature of the institution receiving that aid must be appropriately considered and balanced to determine whether the Establishment Clause prohibits a particular school aid program.

In applying this test, it is helpful to examine Hunt v. McNair, 413 U.S. 734 (1973), a case remarkably similar to the case before us.  In Hunt, the United States Supreme Court entertained a challenge to the South Carolina Educational Facilities Authority Act.[7]  The legislative purpose for the South Carolina statute was " 'to assist institutions for higher education in the construction, financing and refinancing of projects . . . primarily through the issuance of revenue bonds.' "  413 U.S. at 736 (quoting S.C. Code Ann.

---

[7] S.C. Code Ann. § 22-41, an Act similar to Virginia's Educational Facilities Authority Act.

§ 22-41.4 (Supp. 1971)).  The South Carolina Act, like Virginia's, explicitly provided that the bonds shall not be obligations of the state directly or indirectly.  See id. at 737 (quoting S.C. Code Ann. § 22-41.10 (Supp. 1971)).  As in Virginia, none of the general revenues of South Carolina was used to support a particular project.  See id. at 738.

Justice Powell, writing for the Court in Hunt, succinctly characterized the nature of the aid afforded the college:

> The advantage of financing educational institutions through a state-created authority derives from relevant provisions of federal and South Carolina state income tax laws which provide in effect that the interest on such bonds is not subject to income taxation.  The income-tax-exempt status of the interest enables the Authority, as an instrumentality of the State, to market the bonds at a significantly lower rate of interest than the educational institution would be forced to pay if it borrowed the money by conventional private financing.

Id. at 738-39 (footnote omitted).

Considering the three-pronged test articulated in Lemon, the Court in Hunt found that the "purpose of the statute is manifestly a secular one."  Id. at 741.  Also, the Court concluded that periodic inspection of the facilities to ensure compliance with restrictive use did not threaten excessive governmental entanglement with religion.  See id. at 745-49.  In consideration of the second prong of the Lemon test, the

Court, citing _Walz_ and _Tilton_, noted: "[w]hatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected." _Hunt_, 413 U.S. at 742-43.

Upon review of the sparse record in that case, the Court observed that there was "no basis to conclude that the College's operations are oriented significantly towards sectarian rather than secular education." _Id_. at 744. The Court further stated, "we are satisfied that implementation of the proposal will not have the primary effect of advancing or inhibiting religion." _Id._ at 745. Appended to that statement at the end of the discussion of the "primary effect test," the Court specifically declined to address the very issue presented in the case before us today. _Id._ at 745 n.7.

In footnote seven, the Court suggested that even if an institution is pervasively sectarian, the aid in question may be so unique that the provision of the aid does not result in "the primary effect" of advancing or inhibiting religion. The footnote in its entirety states as follows:

> The "state aid" involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only

state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available.  The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a "governmental service." Clayton v. Kervick, 56 N.J. 523, 530-531, 267 A.2d 503, 506-507 (1970).  The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a "mere conduit."  [Hunt v. McNair, 258 S.C. 97, 107, 187 S.E.2d 645, 650 (1972), aff'd, 413 U.S. 734 (1973)]. Because we conclude that the primary effect of the assistance afforded here is neither to advance nor to inhibit religion under Lemon and Tilton, we need not decide whether, as appellees argue, Brief for Appellees 14, the importance of the tax exemption in the South Carolina scheme brings the present case under Walz v. Tax Comm'n, 397 U.S. 664 (1970), where this Court upheld a local property tax exemption which included religious institutions.

Id. at 745.

In Walz, an owner of real estate in New York sought an injunction in state court to prevent the New York City Tax Commission from granting property tax exemptions to religious organizations for properties used solely for religious worship.  See 397 U.S. at 666.  The essence of the complaint was that the grant of a tax exemption to church property indirectly required taxpayers to make a contribution to

religious bodies and thereby violated the Establishment

Clause.   See id. at 667.

Concluding that the legislative purpose of the property

tax exemption was "neither the advancement nor the inhibition

of religion; [and] neither sponsorship nor hostility," id. at

672, the Court stated:

> Granting tax exemptions to churches
> necessarily operates to afford an indirect
> economic benefit and also gives rise to
> some, but yet a lesser, involvement than
> taxing them.  In analyzing either
> alternative the questions are whether the
> involvement is excessive, and whether it is
> a continuing one calling for official and
> continuing surveillance leading to an
> impermissible degree of entanglement.
> Obviously a direct money subsidy would be a
> relationship pregnant with involvement.
>
> * * *
>
> The grant of a tax exemption is not
> sponsorship since the government does not
> transfer part of its revenue to churches
> but simply abstains from demanding that the
> church support the state. . . . There is no
> genuine nexus between tax exemption and
> establishment of religion. . . . The
> exemption creates only a minimal and remote
> involvement between church and state and
> far less than taxation of churches.

Id. at 674-75.  Comparing provision of police and fire

protection to the granting of tax exempt status, the Court

noted that:

> But if as in Everson buses can be provided
> to carry and policemen to protect church
> school pupils, we fail to see how a broader

37

> range of police and fire protection given
> equally to all churches, along with
> nonprofit hospitals, art galleries, and
> libraries receiving the same tax exemption,
> is different for purposes of the Religion
> Clauses.

Id. at 671.

In the case before us, appellees do not contend and we do not find that the VCBA purports to act with the purpose of advancing or inhibiting religion, or that the bond program results in excessive entanglement. Consequently, as in Agostini and Mitchell, we must consider whether the aid results in governmental indoctrination, whether recipients of the aid are defined by reference to religion, and whether the government aid program constitutes an endorsement of religion. As the Court did in Hunt, we must first determine whether Regent is pervasively sectarian. If Regent is pervasively sectarian then, considering Agostini, Mitchell, and a host of other fact-specific cases, we must determine whether the unique nature of the aid is nonetheless permitted without offending the Establishment Clause.

## B. IS REGENT PERVASIVELY SECTARIAN?

Assessment of whether an institution is pervasively sectarian[8] requires consideration of "a general picture of the

---

[8]The phrase "pervasively sectarian" was first utilized in Hunt. "Pervasive" describes that which "pervades or tends to

38

institution, composed of many elements."  Roemer v. Bd. of Pub. Works, 426 U.S. 736, 758 (1976).  Although the Supreme Court has relied on several common factors in making this determination, no one distinct formula has emerged.[9]  In

pervade."  Merriam-Webster's Collegiate Dictionary 868 (10th ed. 1999).  "Pervade" is defined as "diffused throughout every part of."  Id.  "Sectarian" means "of, or relating to, or characteristic of a sect."  Id. at 1056.  Among the definitions of  "sect" are "a religious denomination" and "a group adhering to a distinctive doctrine or leader."  Id.

[9]In Columbia Union Coll. v. Clarke, 159 F.3d 151 (4th Cir. 1998), cert. denied, 527 U.S. 1013 (1999), the United States Court of Appeals for the Fourth Circuit held that the District Court's conclusion on summary judgment that the subject college was pervasively sectarian rested on an incomplete record and that the District Court failed to consider the facts before it in the light most favorable to the college. In its analysis, the majority of the court identified four general areas of inquiry encompassing the characteristics of a pervasively sectarian college as identified by the Supreme Court in Roemer, Tilton, and Hunt: "(1) does the college mandate religious worship, (2) to what extent do religious influences dominate the academic curriculum, (3) how much do religious preferences shape the college's faculty hiring and student admission processes, and (4) to what degree does the college enjoy 'institutional autonomy' apart from the church with which it is affiliated."  Columbia Union, 159 F.3d at 163 (citing Roemer, 426 U.S. at 755-58; Hunt, 413 U.S. at 743-44; Tilton, 403 U.S. at 685-86).  The court noted that none of these factors "in isolation is dispositive."  159 F.3d at 163. The dissent summarized these categories differently, noting that consideration must be given to:

> [T]he extent to which the religious institution is affiliated with or controlled by a church, see [Roemer, 426 U.S.] at 755; Hunt, 413 U.S. at 743; whether religious indoctrination is one of the institution's purposes, see Roemer, 426 U.S. at 755; whether the school is characterized by an atmosphere of academic freedom, see id. at 756; whether the institution encourages or requires prayer, see id. at 756-57; whether there are religious

39

identifying characteristics of a pervasively sectarian institution, the Court has considered: (1) whether the institution is formally affiliated with a church and the amount of institutional autonomy it enjoys apart from the church with which it is affiliated;[10] (2) whether one of the purposes of the institution is the indoctrination of religion and whether the institution's activities reflect such a purpose or exert dominating religious influence over the academic curriculum;[11] (3) whether the institution reflects an atmosphere of academic freedom;[12] (4) the institution's policy on classroom prayer or other evidence of religion entering into elements of classroom instruction;[13] (5) the existence and utilization of religious qualifications for faculty membership

---

qualifications for faculty hiring or student admissions, see id. at 757-58; Hunt, 413 U.S. at 743-44; and the religious makeup of the student population, see Roemer, 426 U.S. at 757-58; Hunt, 413 U.S. at 744.

Columbia Union, 159 F.3d at 174 (Wilkinson, C.J., dissenting).

[10] See, e.g., Roemer, 426 U.S. at 755; Hunt, 413 U.S. at 743; Tilton, 403 U.S. at 686.

[11] See, e.g., Roemer, 426 U.S. at 755; Tilton, 403 U.S. at 686.

[12] See, e.g., Roemer, 426 U.S. at 756; Tilton, 403 U.S. at 686-87.

[13] See, e.g., Roemer, 426 U.S. at 756-57.

or student admission;[14] and (6) the religious composition of the student population and faculty.[15]

Our examination of Regent pursuant to the Establishment Clause and Article I, § 16 of the Constitution of Virginia requires consideration of whether the institution is pervasively sectarian. While Regent (with the exception of the School of Divinity) may not have a primary purpose of religious training or theological education, upon consideration of the factors utilized to determine whether an institution is pervasively sectarian, we hold that Regent is such an institution. The lengthy description of Regent in this opinion amply and conclusively supports this determination.

C.  REGENT'S PARTICIPATION IN THE BOND FINANCING PROGRAM

Having established that Regent is a pervasively sectarian institution, we must consider whether it nonetheless is permitted to participate in the VCBA bond program without offending the Establishment Clause. We turn to the remaining interrelated questions unique to this case: whether the aid results in government indoctrination, whether the aid program

---

[14] See, e.g., Roemer, 426 U.S. at 757; Hunt, 413 U.S. at 743-44.
[15] See, e.g., Roemer, 426 U.S. at 757-58; Hunt, 413 U.S. at 744; Tilton, 403 U.S. at 686.

41

defines its recipients by reference to religion, and whether the aid program constitutes an endorsement of religion.

It is important to distinguish at the outset the unique nature of the governmental aid involved in the VCBA bond program.  Because the bond proceeds are the funds of private investors, the bond proceeds are not governmental aid received by the institution.  No taxpayer dollars are transferred directly or indirectly to a participating institution.  No taxpayer dollars are pledged or utilized as surety for bond obligations.  Unlike the aid programs reviewed in many of the cases that define Establishment Clause jurisprudence, there is no government money utilized for construction or maintenance of buildings, for provision of bus transportation, for reimbursement of educational expenses, for provision of teachers on or off private school premises, or for the provision of books or materials of any kind.

The aid does not involve usage of governmental funds and, in the traditional sense in which the terms have been used, the terms "direct aid" or "indirect aid" are simply inapplicable.  The Court acknowledged this unique difference in footnote seven of its opinion in Hunt.  The nature of this aid is properly defined as the granting of tax exempt status to the bonds which has the incidental result of permitting a qualifying institution to borrow funds at an interest rate

42

lower than conventional private financing.  The South Carolina Supreme Court in Hunt, 187 S.E.2d at 650, characterized the role of the state as a "mere conduit," and the New Jersey Supreme Court in a similar case called the bond provisions a "governmental service."  Clayton, 267 A.2d at 507.

The program is available to all qualifying institutions of higher education in the Commonwealth, without regard to religious affiliation.  There is no "financial incentive to undertake religious indoctrination" in the provision of this unique aid because:

> This incentive is not present . . . where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis. Under such circumstances, the aid is less likely to have the effect of advancing religion.

Agostini, 521 U.S. at 231.  See Widmar v. Vincent, 454 U.S. 263, 274 (1981).

It cannot be disputed that an interest rate or tax exemption has exclusively secular content.  Because no government funds flow to Regent, it cannot be said that government funds are utilized for indoctrination of religious belief or that there is diversion of government funds for

religious activity or that government funds are utilized for any programs, "supplemental" or otherwise.

Additionally, Regent receives these funds because of the genuinely independent choices of investors.  Only the purchase money of private investors flows to Regent.  If no private investors purchase bonds issued on behalf of Regent, no funds flow to Regent.  Thirty-five such bond issues preceded the proposed bond issue on behalf of Regent.  An investor's choice between VCBA bond issues or between VCBA bonds and other securities is a choice presumably based upon market factors and personal circumstances.  In any event, such a choice "cannot be attributed to state decision making."  Zobrest, 509 U.S. at 10; see also Witters, 474 U.S. at 493.  As Justice O'Connor stated in Mitchell:

> [W]hen government aid supports a school's religious mission only because of independent decisions made by numerous individuals to guide their secular aid to that school, "no reasonable observer is likely to draw from the facts . . . an inference that the State itself is endorsing a religious practice or belief." Witters, supra, at 493 (O'CONNOR, J., concurring in part and concurring in judgment).  Rather, endorsement of the religious message is reasonably attributed to the individuals who select the path of the aid.

___ U.S. at ___, 120 S.Ct. at 2559 (O'Connor, J. concurring).

44

The issuance of VCBA bonds on behalf of Regent does not result in governmental indoctrination because it determines eligibility for aid neutrally.  Any funds that Regent receives are from the private choices of investors.  The aid has no impermissible content.  No government funds ever reach Regent's coffers.  No government funds are used or pledged for any purpose and "this carefully constrained program also cannot reasonably be viewed as an endorsement of religion." Agostini, 521 U.S. at 235.  We hold that, with the exception of the School of Divinity, allowing Regent's participation in the VCBA bond financing program does not offend the Establishment Clause.

## VI.   FREE SPEECH

Because we find that inclusion of Regent in the VCBA bond financing program is permissible under the Act and the Constitution of Virginia and further, that the Establishment Clause does not preclude Regent's participation, it is not necessary to resolve the free speech issues raised by the Authority.  See Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819 (1995); Columbia Union, 159 F.3d 151.

## VII.   THE DIVINITY SCHOOL

Although we hold that Regent's general participation in the VCBA bond program does not violate Article I, § 16 of the Constitution of Virginia, we find the specific language of

45

Article VIII, § 11 and the specific terms of the Act prohibit use of bond-financed facilities by the School of Divinity. The constitutional provision states in pertinent part that aid may not be given for facilities "to provide religious training or theological education."

Additionally, the VCBA Resolution approving the bond issue mandates that no bond proceeds will be used to provide facilities for the School of Divinity. Given the acknowledged mission and purpose of the School of Divinity, we find that it would violate the Act and Article VIII, § 11, as well as the VCBA Resolution to allow use of bond-financed facilities by the Regent School of Divinity.

Although the trial court never reached the issue, Dr. Selig proposed that Regent make a pro-rata equity contribution for the portion of the Alexandria building utilized by the School of Divinity. If pro-rata equity contribution proved unacceptable, Dr. Selig proffered that Regent "would lease space out elsewhere." We need not consider whether the pro-rata equity contribution proposal violates the Act or Article VIII, § 11, because we find that the terms of the VCBA Resolution do not provide for it. Pursuant to the Resolution, bond-financed facilities may not be utilized by the School of Divinity.

VIII.  CONCLUSION

46

With the exception of the School of Divinity, we hold that inclusion of Regent in the VCBA bond financing program does not violate the Act, the Constitution of Virginia, or the Establishment Clause.  We hold that Article VIII, § 11 and the terms of the Act prohibit utilization of bond-financed facilities by the School of Divinity and that the VCBA Resolution does not provide for pro-rata equity contribution for use by the School of Divinity.

We will reverse the order of the trial court refusing validation of the bonds and remand for entry of an order validating the bonds consistent with this opinion.

*Reversed and remanded.*

JUSTICE KOONTZ, with whom JUSTICE KEENAN joins, concurring in part and dissenting in part.

Beyond question, Regent University is a nonprofit "private Christian university" that benefits the people of this Commonwealth by providing them the opportunity to learn and to develop their intellectual capacities, Code § 23-30.39, through eight accredited colleges offering twenty graduate degrees.  However, the quality of the educational experience provided by Regent is not at issue here.

While Regent rightfully enjoys a reputation for educational excellence, the record demonstrates that Regent seeks to educate its students in strict conformity with its

47

adopted Mission Statement.  According to this Statement,
Regent "exists to bring glory to God the Father and His Son
Jesus Christ through the work of the Holy Spirit[,] . . . to
provide an exemplary graduate education from biblical
perspectives to aspiring servant leaders in pivotal
professions"[, and] to be a leading "center of Christian
thought and action."  Indeed, as noted in the majority
opinion, Regent was founded to "train mature men and women for
the challenge of representing Christ in their professions,"
incorporated "to recover the Christian heritage of our
nation," and has the "ultimate purpose" to "glorify[] God and
His Son, Jesus Christ."

The majority concludes that Regent is a pervasively
sectarian institution and that, for the reasons stated in the
majority's opinion, the use of bond-financed facilities by
Regent's School of Divinity is prohibited.  I concur in these
conclusions.

I disagree, however, with the majority's conclusion that
Regent otherwise qualifies to participate in the revenue bond
program under consideration as an institution of higher
education "whose primary purpose is . . . not to provide
religious training or theological education."  Code § 23-
30.41(e).  My conclusion to the contrary is based on three
factors.  First, the majority misstates the standard of

review, and thereby fails to apply the law to the evidence viewed in the light most favorable to Lynn and the other appellees, the prevailing parties at trial.  Second, the majority violates established rules of statutory construction and effectively rewrites Code § 23-30.41(e), by determining that the statutory phrase "a nonprofit educational institution . . . whose primary purpose is . . . not to provide religious training or theological education" can be limited to institutions or departments within institutions that prepare students for specific religious vocations.  Third, the majority bases its definition of this statutory phrase on source materials that are taken out of context.

Initially, I agree that the issue whether Regent is eligible for participation in the revenue bond program under the Educational Facilities Authority Act, Code §§ 23-30.39 through -30.58, is a mixed question of law and fact.  However, contrary to the conclusion reached by the majority, the record reveals that certain material facts are in dispute.  Thus, we are compelled to give deference to the factual findings of the trial court which "sat as the fact finder and, insofar as the evidence is in conflict, we view the facts and all reasonable inferences raised by the evidence in the light most favorable to [the prevailing party] and consider whether the trial court correctly applied the law thereto."  Carmody v. F. W.

Woolworth Co., 234 Va. 198, 201, 361 S.E.2d 128, 130 (1987); Bassett Furniture v. McReynolds, 216 Va. 897, 899, 224 S.E.2d 323, 324 (1976).

As a mixed question of law and fact, the determination of Regent's primary purpose presented factual issues for the trial court's consideration. There was a clear conflict in the evidence presented by the VCBA, namely, between the content of the numerous exhibits and the trial testimony of Regent Provost Dr. William George Selig. Many of the exhibits were facially in conflict with Dr. Selig's testimony. The trial court resolved that conflict against the VCBA by its finding that Regent's primary purpose is religious training.

The fact that the court's decision "was not based on any credibility findings with regard to the witnesses" does not reflect an absence of conflict in the evidence, but explains the court's view that the witnesses' testimony did not lack credibility. Thus, the court considered all the testimony and exhibits in reaching its ultimate determination, which is supported by evidence in the record.

Notably absent in the majority opinion is significant evidence that supports the trial court's finding. The following evidence was presented concerning Regent's colleges, academic freedom policy, and faculty and staff.

The College of Communications and the Arts is designed to "develop persons who think as Christians about communication studies." Its program in the School of Cinema-Television and Theatre Arts "is dedicated to equipping communication professionals with a biblically based perspective in the mass media and theatre arts." Its Script and Screenwriting program is designed to "prepare graduates to become leaders who will be creative communicators through their script and screenwriting and their ability to implement the truths and principles of the Word of God." "The program is administered and shaped for the purpose of helping students integrate the Word of God in their chosen profession." Its Ph.D. program involves "an intense effort to develop scholars who are able to integrate a Christian worldview with their chosen discipline within communication as they teach, conduct research and practice their professions." Prospective students must submit a writing sample "indicating [an] ability to integrate a Christian worldview with the field of communication and the arts and directly relat[ing] that topic to the Word of God and/or the Judeo-Christian worldview." The school looks for "students who closely identify with [Regent's] mission of leadership—Christian Leadership."

The School of Counseling (the school) seeks to help students "synergize personal faith with practice in public,

private, academic, and corporate arenas," and is "the only

evangelical program of its kind on the East Coast."  The

faculty of the school is "united by a common commitment to a

Christian worldview."  The school's programs "embody a model

of Christian counseling[,] . . . based upon scriptural

understanding of human nature."  The school "endeavors to

provide leadership integration of sound clinical procedure and

biblically based values in program development and health

service provision."  A "distinctive" feature of its programs

is "the integration of counseling knowledge, skills, and

strategies with biblical foundations and faith practices."

The school summarizes this as follows:

> [S]ince there is no agreed-upon definition regarding
> the use of faith within the counseling process, we
> present integration as a process rather than a
> separate course or series of techniques.
> Integration begins in our own Christian walk.  Our
> programs give additional tools and guides for the
> process and, hopefully, plant seeds that continue to
> grow and mature long after the degree is obtained.
> We intentionally teach faith principles as
> integrated within counseling practice, recognizing
> that in an academic setting this encounter may be
> artificial.  A student's understanding and knowledge
> of integration brings fruition in a counseling
> practice setting with continued processional and
> spiritual maturation and experience.

> Biblical Foundations

> We believe that God exists, is the source of all
> truth, and is a just, loving, compassionate
> Creator and Redeemer who calls us to relationship
> with Himself and others.  Theory and practice in
> the field of counseling are taught in conjunction

52

with application of biblical principles and values.  Students are encouraged to study in such theological areas as hermeneutics, systematic theology, Christian ethics, the nature of God and man, and the use of biblical principles and Christian disciplines in the counseling setting.

The school offers three degrees: a clinical masters degree (M.A.), a nonclinical masters degree (M.A.), and a doctor of psychology degree (Psy.D.).  The clinical M.A. "combines contemporary counseling techniques and theories with a solid biblical foundation for a spiritual balance in the counseling approach."  The nonclinical M.A. is "designed to offer human relations training to clergy and others active in Christian ministry who desire counseling skills."  "The purpose of this nonclinical track is to provide training and practice in interpersonal skills using a foundation of biblical human nature."  "The goal of the program is not to develop clinical professionals, but to train students who seek to help others within a church/ministry setting."  (Emphasis added).

Finally, the doctorate program has "an integrative approach," that calls for the "integration of faith and practice."

Courses offered by the school include:

Integrative Issues in Counseling[:] An exploration of the possibilities and limits for integrating various psychological theories and Christian faith in counseling.  Students will review and assess previous models for integration as a step toward developing their own approach to integrating theory and Christian faith in clinical practice.

Hermeneutics and Application[:] This course
analyzes and synthesizes principles of biblical
hermeneutics and psychological practice.
Students are taught basic skills in the inductive
method of observing, interpreting and applying
the Christian Scriptures.  As a means to this
end, an intensive inductive study is made of the
Gospel of Mark (chapters 1-3).  Other passages
from the Bible are considered as they address
areas of therapeutic application for various
psychological problems and disorders.  Role-play
and demonstration of application of skills are
analyzed, critiqued and synthesized.
* * *

Traditions in Christian Healing: An Integrated
Approach[:] A holistic Christological approach to
exploring and reconsidering the gifts and graces
of God for healing the various aspects of the
human person.  An integrated approach will
include a biblically based analysis and synthesis
of historical Christian traditions pertaining to
healing and deliverance as these relate to the
practice of counseling.

* * *

Clinical Practica[:] A supervised clinical
practicum experience in an appropriate work
environment for six semesters for two credits per
semester.  Students will learn how to integrate
their Christian worldview and practice with the
theory and practice of psychology.

The School attributes the "ultimate goal" of counseling to be

the patient's "maturation in the image of Christ," and it

seeks to produce graduates who "reflect the character of

Christ within their professional involvements."

"The primary mission of the Regent University School of

Education is to prepare leaders from a biblical perspective in

order that they might significantly impact education worldwide."  Its "programs are based on time-honored biblical standards," and its faculty have a "worldview based upon a core of biblical beliefs."  Through the program, "students learn how to integrate research-supported concepts and skills with a biblical worldview."  The "Christian School Program" of the School of Education "prepares Christian school teachers and administrators to educate toward God's expectations for Holy Nation citizenship (I Peter 2:9)."  This program offers classes such as:

> Christian Heritage[:] This course develops the theme of holy nation citizenship (I Peter 2:9) and its implications for Christian education.  It provides the purpose and outcomes for Christian education using the subject matters of Biblical text, Christian history, Christian classics, and the skills of logic and rhetoric. . . . Hermeneutics in Education[:] Students will learn to use inductive Bible study methods and apply them to educationally relevant questions. Additionally, students will learn how to teach Biblical content to learners of various ages. Biblical Integration/Apologetics[:] This course focuses on the integration of Biblical content in the student's personal and professional life. Students will examine methods, models and curriculum examples of personal and professional Biblical Integration.  Students will also write a sample-integrated curriculum.

Regent's School of Business' mission is to "transform society through Christian leadership" and to prepare its students "to build dynamic organizations that provide life-improving products and services in a way that points to the

life-giver, Jesus Christ [through] servant-leadership (Matthew 20:20-28)."  The materials for the School of Business state that it "desires to admit students" who share the school's mission and who "believe God called them to lead others in business and management for the glory of God."  The school attempts to "[i]mpart graduate-level knowledge and skills within a biblical world-view, . . . [i]mpart a balanced view of the Christian life[, and] [h]elp students develop life plans that are consistent with God's call on their lives and good stewardship of their gifts and talents."  Its masters in business administration program and masters in management program in the nonprofit management track are designed to prepare students to "[i]mplement a comprehensive plan for [their lives] which relates spirituality to work in a way that glorifies Christ," and to "[h]elp others grow, develop and increase productivity and improve people skills using biblical principles in the power of the Holy Spirit."  In these programs, students are required to take six credits of electives that may come from the School of Divinity, and may include courses such as "Salvation, The Holy Spirit & Christian Living," and "Birth of the Theocratic Nation."

Regent's other schools also reflect a strongly integrated Christian viewpoint.  Regent's School of Government is premised on the view that "[t]he United States of America is a

nation founded upon biblical principles," and it is "the goal of the Robertson School of Government that this heritage be restored, renewed and enhanced in America, and that this heritage also be planted and nurtured in other nations." Regent's Center for Leadership Studies is self-described as the "premier leadership-training center for the Christian world," and it is founded on a "framework grounded in biblical truths." Scripture is integrated into the Law School curriculum because "a lot of law has come from a biblical perspective."

Regent's policy provides that academic freedom is defined in a "context of standards or norms" including:

> 1. God is the source of all truth. The Scriptures are the written expression of truth and the revealed will of God. There is also natural revelation. Both types of revelation contribute to our understanding of truth.
> 2. Academic freedom functions within Regent University's mission statement and its statement of faith. Specifically, within the mission statement, the faculty member takes the role of being a Christian leader in order to model Christian leadership to students. Academic freedom serves to make the university a "leading center of Christian thought and action." Regent's vision, ". . . to transform society by affirming and teaching principles of truth, justice and love, as described in the Holy Scriptures, embodied in the person of Jesus Christ, and enabled through the power of the Holy Spirit," can be achieved only if faculty demonstrate these principles in the classroom.

Regent's policy provides that "research efforts must be guided by three sources of criteria: the Holy Bible, civil laws and statutes, and the mission of Regent University."

With respect to its curriculum, each faculty member at Regent is required to include in the syllabus for each class a "description of how the Christian faith and the Bible will be incorporated into the course." At Regent, "[i]t is desirable that all prospective faculty be proficient in effectively integrating their faith and learning," and proficiency may be demonstrated "by submitting a paper of an integrative nature or developing course materials that demonstrate appropriate integrative skills and understanding. The dean will review these materials and may consult with a member of the School of Divinity." Those faculty members who do not demonstrate this proficiency are required to obtain it within three years of hiring by completing one or more of the following activities: a prescribed course of study in "Christian doctrine and/or hermeneutics offered by the School of Divinity, a prescribed reading list on doctrine, hermeneutics and integration, or a lecture and discussion series offered jointly by the School of Divinity and other schools within the University." Dr. Selig conceded that faculty are expected to "hold tight" to the Statement of Faith, "understand[] the relation between what they teach and what they believe . . . starting, . . . from

the Mission Statement or Statement of Faith, and . . . teach students from that perspective."

Regent hires only Christian faculty and staff. Faculty and staff are required to agree with and adhere to Regent's Statement of Faith. Faculty applicants must submit a statement regarding their "conversion, Christian commitment, and . . . acquaintance with the present-day renewal movement which emphasizes the gifts, fruits and ministries of the Holy Spirit." This Statement is reviewed by a University official to determine whether an interview is appropriate. Dr. Selig testified that this review is designed to ensure that the applicant adheres to Regent's characterization of Christianity:

> [W]e have had people who have applied who said
> that they were of a Christian persuasion, but in
> reading it, we find that they're not of a
> Christian persuasion, not what we would call a
> Christian persuasion. . . . We have people who
> have applied who say they're Christians but have
> many gods, and that's not what we describe as
> Christian. . . . We'd rather not have this
> person arrive here and find out that they didn't
> fit.

Although Dr. Selig testified that faculty members are "not required" to attend chapel, and that no punitive sanctions are taken against persons who do not show up for these services, he conceded that Regent "strongly encourages" chapel attendance. According to Regent's Faculty Handbook,

Staff Handbook, Faculty Application, and Staff Application, it is "imperative that Regent University faculty, staff and students . . . maintain an exemplary and involved lifestyle including regular church attendance."  The Employee Handbook states:

> Because the purpose of the University is to serve and to glorify the Lord Jesus Christ, it is essential that all members of the University community approach Him as a body to seek His guidance, strength and blessings.  Therefore, for approximately thirty minutes at least one day of each week, at or near the noon hour, the University convenes corporately for chapel services.  All employees are expected to be in chapel unless specifically exempted by their supervisor.

Furthermore, Regent maintains a tenure system for its faculty members and one of the "Performance Review Criteria for Faculty" is that "because of the unique mission of Regent University . . . it is expected that faculty members will exhibit spiritual vitality through their Christian witness, both personally and professionally."  The Faculty Handbook further divides these Performance Review Criteria into three basic areas, one of which includes "[c]onducting student Bible study/fellowship groups and regularly attending chapel."  Additionally, when applying for promotion and tenure, faculty members are required to complete a dossier that includes a "Summary of Christian activities/spiritual vitality, which includes such things as frequency of chapel attendance,

participation in staff devotions, home Bible studies, church activity and involvement in other areas where there has been a demonstration of spiritual vitality."

The question before us then becomes whether, as a matter of law, the trial court correctly applied Code § 23-30.41(e) to the evidence regarding Regent's primary purpose. In this respect, it is necessary to determine the meaning of the statutory phrase "religious training or theological education." The majority interprets "theological education" to mean education preparing "students for vocations associated with ordination, such as rabbi, minister or priest." In contrast, the majority interprets "religious training" to mean education preparing "students for religious vocations other than those associated with ordination." Thus, the majority concludes that this phrase refers only to "institutions or departments within institutions" whose "primary function is educating students for religious vocations."

The majority supports this determination by citing the Report of the Commission on Constitutional Revision (1969)(the Report). In particular, the majority relies on a reference in the Report to a Memorandum submitted by the Association of Independent Colleges, which is contained in the public commentary received by the Commission. See Report at 274 n.39. However, a reading of this material in its full context

does not support the majority's reliance on the quoted portion of the Memorandum. While the quoted portion does appear in the pages referenced in the Report, the pages are not cited, as the majority implies, to clarify the meaning of the phrase "religious training."

Instead, the Report cites the Memorandum for its factual assertion that nine Virginia colleges within the Association had "some degree of church relationship" but did not "impose[] any religious tests for student admission or faculty selection" or "serve[] primarily a single religious faith." Report at 274. The Commission thus drew a clear distinction between institutions that do not emphasize their church relationship and those that put strong emphasis on religious faith. Unquestionably, Regent falls in the latter category in that it imposes a religious test for faculty selection and takes religion into account in its student admissions.

The portion of the Memorandum quoted by the majority cites 20 U.S.C. § 751(a)(2) for the distinction drawn in the Memorandum "between a church related college and an institution . . . whose primary function is educating students for religious vocations." Memorandum at 6. Yet, this distinction appears in the federal statute for the purpose of defining a "school or department of divinity," namely, as an institution "whose program is specifically for the education

of students to prepare them to become ministers of religion or to enter upon <u>some other religious vocation</u> . . . ."  20 U.S.C. § 751(a)(2) (1968) (repealed) (emphasis added).[*]  This portion of the federal statute with its "religious vocation" language does not, as the majority implies, purport to define the broader term "religious training."

Finally, the distinction in the quoted portion on which the majority relies between "an institution whose primary service is to the state and community and one whose primary service is to a religious or denominational group," clearly does not support the conclusion that "religious training" as used in Code § 23-30.41(e) refers to education preparing "students for religious vocations other than those associated with ordination."  To the contrary, preparing a student for a religious vocation has an even more limited meaning than is contemplated by the phrase "primary service . . . to a religious or denominational group."

_____

[*]Although 20 U.S.C. § 751(a)(2) is no longer in effect, the same definition can be found in current statutes, and its limited application is apparent in each.  See e.g., 20 U.S.C. § 103(9)(A); 20 U.S.C. § 1062(c)(1); 30 U.S.C. § 1325.  Like the federal statute, the Virginia Act at issue here separately excludes "any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination."  Code § 23-30.41(b).

In my view, the majority opinion effectively rewrites Code § 23-30.41(e). The General Assembly's use of the disjunctive word "or" clearly denotes that "religious training" is not the same as "theological education" within the context of this statute. Moreover, the word "vocation" does not appear anywhere in the statute. It is generally accepted that one's vocation is the work in which a person is regularly employed and, in context, the term ordinarily does not equate to a professional or occupational status such as that of rabbi, minister, priest, missionary, or director of religious education acquired only through theological education.

Indeed, applying even the narrow interpretation used by the majority and contrary to the majority's reasoning in footnote 4, the nonclinical M.A. degree in counseling violates the prohibition in Code § 23-30.41(e) because "[t]he goal of the program is not to develop clinical professionals, but to train students who seek to help others within a church/ministry setting." However, it is clear that the statute does not support the piecemeal analysis resorted to by the majority. Code § 23-30.41(e) refers to an "institution" rather than schools, departments, or programs within an institution. Thus, even though I concur that Regent's School of Divinity is ineligible to participate in the bond program,

Code § 24-30.41(b), the focus of our inquiry should not be a dissection of Regent into its constituent schools and their departments and programs, but an examination of the "primary purpose" of that institution as a whole.

The limitation contained in Code § 23-30.41(e) is expressed in clear and unambiguous terms. We have repeatedly stated that when the language in a statute is clear and unambiguous, we apply the plain meaning rule. Under this rule, we endeavor to ascertain and give effect to the intention of the legislature from the words used in the statute, unless a literal construction of the statute would yield an absurd result. We may not adopt a construction of the statute that would amount to a holding that the legislature did not mean what it actually has expressed. See generally Earley v. Landsidle, 257 Va. 365, 369-70, 514 S.E.2d 153, 155 (1999); Catron v. State Farm Mutual Auto Insurance Co., 255 Va. 31, 38, 496 S.E.2d 436, 439 (1998); Hubbard v. Henrico Ltd. Partnership, 255 Va. 335, 339, 497 S.E.2d 335, 377 (1998); and City of Winchester v. American Woodmark Corp., 250 Va. 451, 457, 464 S.E.2d 148, 152 (1995).

When so viewed, the language of Code § 23-30.41(e) applies to an institution of higher education whose primary purpose, that is, its principal purpose, is to provide religious training or theological education rather than

general secular education.  In this context, the statute acknowledges that a particular institution may have only one purpose or some combination of all these purposes. Accordingly, the limiting language of this statute applies only where a particular institution's primary purpose is religious training or theological education.  Theological education is not at issue here.  Religious training contemplates teaching religious doctrine to accomplish a particular result.  Thus, when an institution's principal purpose is to teach its particular religious doctrine, and when the institution pursues that principal purpose through its teaching of secular subjects, that institution has as its primary purpose religious training within the meaning of Code § 23-30.41(e).  The record clearly reflects that such is the case with Regent.

While the fact that Regent is a pervasively sectarian institution does not compel the conclusion that its primary purpose is religious training, it is a fact to be considered in the determination required under Code § 23-30.41(e).  As the majority has concluded, Regent is a "pervasively sectarian institution[,]" because it is " 'an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in [its] religious mission.' "  Habel v. Industrial Development Authority, 241 Va. 96, 101, 400

S.E.2d 516, 519 (1991)(quoting Hunt v. McNair, 413 U.S. 734, 743 (1973)). Moreover, the record supports the conclusion that Regent is operated in strict conformance with its Mission Statement, Articles of Incorporation, Statement of Faith, and academic freedom policy. Also controlling the operation of Regent are the policies governing faculty and staff as reflected in the Faculty Handbook, Staff Handbook, Faculty Application, and Staff Application, and the requirements of the secular courses offered to sustain Regent's religious purpose. In short, the record compels the conclusion that Regent's stated "ultimate purpose," which is to "glorify[] God and His Son, Jesus Christ," is indeed its "primary purpose" within the meaning of Code § 23-30.41(e).

On brief, the VCBA contends that if the limitation contained in Code § 23-30.41(e) bars it from participating in the revenue bond program at issue here, that this constitutes impermissible "viewpoint discrimination" under the First Amendment. See Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 839 (1995). Because the VCBA failed to assert this argument in the trial court, the VCBA may not raise that issue for the first time in this appeal. Rule 5:25.

For these reasons, I respectfully dissent from the majority's holding that the trial court erred in ruling that

Regent was ineligible to participate in bond financing under the Educational Facilities Authority Act.  Because I would hold that the Act does not permit Regent to participate in this bond program, the issue whether its participation would violate the Establishment Clause is moot.  Accordingly, I do not address that issue considered in the majority opinion.