COLUMBIA UNION COLLEGE, Plaintiff

v.

Edward O. CLARKE, Jr.,
et al., Defendants

No. Civ.A. MJG–96–1831.

United States District Court,
D. Maryland.

Oct. 28, 1997.

R. Hewitt Pate, Sara C. Johnson, Hunton & Williams, Richmond, VA, Mark B. Bierbower, Hunton & Williams, Washington, DC, for Plaintiff.

Mark J. Davis, Linda H. Lamone, Richard A. Weitzner, Atty. General's Office–Educational Affairs Division, Baltimore, MD, for Defendants.

## MEMORANDUM AND ORDER

GARBIS, District Judge.

The Court has before it Defendants' Motion for Summary Judgment, Columbia Union College's Cross–Motion for Summary Judgment, and the materials submitted by the parties relating thereto. The Court finds that a hearing is unnecessary.

## I. BACKGROUND

In 1971, the Maryland General Assembly created a program of aid to nonpublic institutions of higher education, known since 1993 as the Joseph A. Sellinger Program ("Sellinger Program"). See Md.Code.Ann.Educ. § 17–101 et seq. The aid under this program is in the form of annual payments of state funds directly to eligible institutions.

Authority to administer the Sellinger Program has been delegated to the Maryland Higher Education Commission ("the Commission") Md.Code Ann.Educ. § 17–102. To qualify for funds, an institution must: (1) be a nonprofit private college or university that was established in Maryland before July 1, 1970; (2) be approved by the Commission; (3) be accredited; (4) have awarded the associate of arts or baccalaureate degrees to at least one graduating class; (5) maintain one or more programs leading to such degrees, other than seminarian or theological programs; and (6) submit each new program or major modification of an existing program to the Commission for its approval. Md.Code Ann.Educ. § 17–103. In addition, the statute commands that no Sellinger funds may be used for sectarian purposes. Md.Code Ann. Educ. § 17–107.

In January 1990, Plaintiff Columbia Union College, a private four-year college affiliated with the Seventh-day Adventist Church, applied for funds under the Sellinger Program. Plaintiff satisfied each of the statutory requirements for participation in the program. On March 24, 1992, however, the Commission concluded that because Plaintiff was a "pervasively sectarian" institution, the Establishment Clause of the First Amendment required that Plaintiff's application be denied.

On December 27, 1995, Plaintiff requested reconsideration of its application in light of the Supreme Court's then-recent decision in *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). On January 22, 1996, the Commission notified Plaintiff that "unless the nature and practices of Columbia Union have changed very substantially since 1992," there would not be any point in reapplying for aid.

In response, in June 1996, Plaintiff filed suit against the Commission seeking declaratory and injunctive relief for alleged constitutional and statutory violations. The Commission moved to dismiss on the ground that Plaintiff's claim was not ripe. On October 24, 1996, at a telephone conference with Judge Kaufman of this Court, it was agreed that Plaintiff would reapply for funds and that the Commission would consider that application on an expedited basis.[1] The parties

1. Although he did not formally rule on the motion to dismiss, Judge Kaufman necessarily rendered it moot in reaching this accord. Indeed, it was the Court's explicit assumption that if Plain-

agreed that the application would be considered without an administrative hearing.

Plaintiff submitted a new application for Sellinger funds on November 12, 1996.[2] On December 11, 1996, the Commission found that Plaintiff was still pervasively sectarian and denied its application.[3]

On December 24, 1996, Plaintiff filed an Amended Complaint ("Complaint") against Defendant Edward O. Clarke, Jr., in his official capacity, and the other members of the Maryland Higher Education Commission, in their official capacities, seeking declaratory and injunctive relief for alleged constitutional and statutory violations.[4] In Count I, Plaintiff alleges that the Commission denied its application for funds in violation of Plaintiff's rights of free speech and association under the First and Fourteenth Amendments. In Count II, Plaintiff contends that this denial deprived it of its rights under the Free Exercise Clause of the First Amendment, made applicable to the states via the Fourteenth Amendment. In Count III, Plaintiff asserts that the denial of its application violated the Equal Protection Clause of the Fourteenth Amendment.

In Count IV, Plaintiff alleges a violation of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb, et seq. In light of the Supreme Court's recent decision that Congress exceeded its constitutional authority in enacting RFRA, Count IV must be dismissed. See City of Boerne v. Flores, —— U.S. ——, ——, 117 S.Ct. 2157, 2160, 138 L.Ed.2d 624 (1997).

Both Plaintiff and the Commission now move for summary judgment on the remaining counts.

## II. *LEGAL STANDARD*

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. A party seeking summary judgment "has the burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984).

In this case, no party contends that there is any genuine issue of material fact. Accordingly, disposition on summary judgment is appropriate.

## III. *DISCUSSION*

### A. *Columbia Union College As a Pervasively Sectarian Institution*

 Under the Establishment Clause, a state may not directly fund institutions that are so "pervasively sectarian" that religion permeates even the secular facets of the institutions. *Roemer v. Board of Pub. Works,* 426 U.S. 736, 755, 96 S.Ct. 2337, 2349, 49 L.Ed.2d 179 (1976). Put another way, a state may not fund an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission. *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). By contrast, if an institution is not pervasively sectarian, its secular activities may be funded. *Roemer,* 426 U.S. at 755, 96 S.Ct. at 2349.

 Because the secular and religious aspects of pervasively sectarian institutions are inextricably intertwined, there is a risk that direct government funding, "even if it is designated for specific secular purposes, may nonetheless advance the pervasively sectari-

---

tiff's application was again denied, a new amended complaint would be filed immediately.

**2.** Plaintiff requested $806,079 for programs in mathematics, computer science, clinical laboratory science, respiratory care, and nursing. Commission's Exhibit D.

**3.** In fiscal year 1997, the Commission approved grants to three other colleges that have some religious affiliation: Loyola College, Mount St. Mary's College, and the College of Notre Dame. Commission's Exhibit S.

**4.** Although as a formal matter, the Commission itself is not a defendant, its members have been sued solely in their official capacities as members of the Commission. Therefore, for convenience, the Court will refer to the defendants collectively as "the Commission."

an institution's 'religious mission.'" [5] *Bowen v. Kendrick*, 487 U.S. 589, 610, 108 S.Ct. 2562, 2574, 101 L.Ed.2d 520 (1988). Such direct funding, therefore; violates the Establishment Clause, as it has the impermissible primary effect of advancing religion.[6] *Bowen*, 487 U.S. at 610, 108 S.Ct. at 2574-75; *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874.

■ In order to determine if a particular college or university is so "pervasively sectarian" that it may not receive any direct state funding, the Court must "paint a general picture of the institution, composed of many elements." *Roemer*, 426 U.S. at 758, 96 S.Ct. at 2350. In analyzing the four Catholic colleges before it, the *Roemer* court considered a variety of factors before concluding that the colleges were not pervasively sectarian. These factors were:

(1) the colleges' high degree of "institutional autonomy" from the Catholic Church; (2) the fact that attendance at religious services was not mandatory; (3) the fact that the colleges' mandatory religion courses merely supplemented broad liberal arts programs; (4) its finding that the colleges' nontheology courses were taught in an "atmosphere of intellectual freedom" and without "religious pressures;" (5) the fact that although some classes began with prayer, there were no policies encouraging the practice; (6) the fact that some instructors wore clerical garb and some classrooms contained religious symbols; (7) the colleges' faculty hiring decisions were not made on a religious

basis; and (8) the student bodies were chosen without regard to religion. *Id.* at 755-58, 96 S.Ct. at 2349-50.

■ After a review of the undisputed factual record, the Court concludes that Columbia Union College is a pervasively sectarian institution.[7] Its religious components are so inextricably intertwined with its secular aspects that, under the Establishment Clause, it may not receive any direct state funding.

Plaintiff is not "characterized by a high degree of institutional autonomy," as were the colleges in *Roemer*. *Id.* at 755, 96 S.Ct. at 2349. For the fiscal year ending on June 30, 1996, Plaintiff received approximately $2.5 million in revenue, or about 21.5% of its total unrestricted educational and general revenues, in the form of "Church Subsidies & Gifts." Commission's Exhibit G. In addition, under Plaintiff's bylaws, at least 34 out of the 38 voting members of its Board of Trustees must be members of the Seventh-day Adventist Church. Commission's Exhibit F at 10. In *Roemer*, on the other hand, none of the colleges received funds from or made reports to the Catholic Church. The Church was represented on the colleges' governing boards, but the Court found that Church considerations did not enter into college decisions. *Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349.

The Supreme Court, in 2 cases prior to *Roemer*, concluded that several colleges, who were arguably under more control by their affiliated church than Plaintiff, were not pervasively sectarian. In *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923

---

5. Plaintiff's argument that the Commission does not "trust" Columbia Union College to use state funds only for secular purposes is immaterial. *See* Columbia Union College's Brief in Support of Cross–Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Brief") at 12. Given the Supreme Court's pronouncements that no state funds at all may be given to pervasively sectarian institutions, Plaintiff's "trustworthiness" is not at issue.

6. A government policy must pass the oft-cited three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in order to pass constitutional muster under the Establishment Clause: "First, the [governmental policy] must have a secular legislative purpose;

second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [policy] must not foster an excessive government entanglement with religion." *Id.* at 612-13, 91 S.Ct. at 2111-12.

7. Plaintiff appears to be correct that, to date, the Supreme Court has not found any college or university, as opposed to a primary or secondary school, to be pervasively sectarian. *See* Plaintiff's Brief at 11. This fact, by itself, does not lead this Court to anything beyond the unremarkable conclusion that a case involving such an institution has not yet made its way onto the high Court's docket. It certainly does not mean that such an institution cannot exist. Indeed, the Plaintiff is a prime example of a pervasively sectarian college.

(1973), the Court concluded that the Baptist College at Charleston was not pervasively sectarian, even though the college's Board of Trustees were elected by the South Carolina Baptist Convention, certain financial transactions required Convention approval, and only the Convention could amend the charter of the college. *Id.* at 743, 93 S.Ct. at 2874. Similarly, the colleges at issue in *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), were governed by Catholic religious organizations. *Id.* at 686, 91 S.Ct. at 2099–2100. These colleges' level of institutional autonomy, however, cannot be viewed in isolation. Taken in context, the colleges at issue in *Hunt* and *Tilton* were far less sectarian than Plaintiff.[8] Therefore, viewing Plaintiff as a whole, its lack of institutional autonomy lends support to the overall conclusion that Plaintiff is pervasively sectarian.

In stark contrast to the Catholic colleges in *Roemer*, Plaintiff requires its students to attend religious services. Traditional students[9] are required to attend chapel once a week and assemblies as scheduled. Plaintiff's Exhibit B at 19. Students who reside in the college's residence halls must also attend three out of six weekly worship options in the residence halls. Commission's Exhibit L at 15. Failure to attend these worship services, without adequate excuse, subjects a student to disciplinary action, including suspension or dismissal from the college.[10] *Id.;* Plaintiff's Exhibit B at 19. Plaintiff is quite different from the colleges in *Roemer* which, rather than requiring church attendance, merely provided religious services for those students who were interested in voluntarily attending. *See Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349.

Like the colleges in *Roemer*, Plaintiff requires students to take religion courses in order to graduate. In Plaintiff's 1996–97 Bulletin, the Religion Department states that it "believes that in a Christian college Christian principles should characterize every phase of college life, whether it be intellectual, physical, social, or moral." Commission's Exhibit H at 211. The department faculty, chosen in part because of "their dedication to Jesus Christ," seeks to "show [students] how Christian principles offer satisfactory answers to the perplexing problems facing the world today ... [and] to inspire everyone to live a life wholly dedicated to the service of the Master." *Id.* This Court shares the *Roemer* court's concern that these religion courses could in practice be devoted to deepening students' religious experiences in the Seventh-day Adventist faith, rather than to teaching theology as an academic discipline. *See Roemer*, 426 U.S. at 756 n. 20, 96 S.Ct. at 2349 n. 20. While the *Roemer* court was satisfied that this danger did not, on its own, lead to the conclusion that the colleges at issue were pervasively sectarian, this Court cannot reach the same conclusion with re-

---

**8.** In *Hunt,* there were no religious qualifications for faculty membership or student admission. In fact, the percentage of the student body that was Baptist was roughly equal to the percentage of Baptists in that geographic area. *Hunt,* 413 U.S. at 743–44, 93 S.Ct. at 2874–75. In addition, the Court held that, unlike the present case, there was no evidence beyond the college's lack of institutional autonomy to indicate that it was pervasively sectarian. *Id.* In *Tilton,* the Court held that the colleges' predominant educational mission was to provide secular educations to their students. The students were not required to attend religious services. While theology courses were mandatory, they were not limited to courses about Roman Catholicism and were taught according to the academic requirements of the discipline and the teacher's concept of professional standards. In addition, the schools subscribed to a well-established set of principles of academic freedom, and made no attempt to indoctrinate students or to proselytize. *Tilton,* 403 U.S. at 686–87, 91 S.Ct. at 2099–2100.

**9.** About 675 students, out of a total enrollment of around 1172, are "traditional", 18–24 year old, students. Commission's Exhibit W at 2.

**10.** Plaintiff's attempt to mitigate the effect of these policies is unpersuasive. Even if Plaintiff is relaxed enough about its excuse policy that only 350 to 400 of the approximately 675 traditional students actually attend services each Wednesday morning, chapel attendance is still officially mandatory. *See* Plaintiff's Brief at 18. A liberal excuse policy does not convert a mandatory attendance requirement into a policy of encouraging voluntary worship. Indeed, Plaintiff admits that worship attendance "is an important part of community activity at Columbia Union, and one in which the College's traditional students are required to participate." Plaintiff's Brief at 18.

spect to Columbia Union College. Rather, these mandatory religion courses contribute to an overall mosaic that is pervasively sectarian.

While Plaintiff claims to foster an atmosphere of intellectual freedom, its Policy Handbook for Administration and Faculty directs faculty members to "bear in mind their peculiar obligation as Christian scholars and members of a Seventh-day Adventist College." Commission's Exhibit N at 2. In exercising their rights and responsibilities, faculty members "have complete freedom so long as their speech and actions are in harmony with the philosophies and principles of the college—a Seventh-day Adventist institution of higher educ[a]tion." [11] *Id.*

Furthermore, the descriptions of several of Plaintiff's nominally secular academic departments are replete with references to religion. For instance, the business department's goal, in addition to graduating students with the requisite technical competence and preparedness, is to instill students with "an approach to people, work, and life that demonstrates outstanding Christian values and ethics." Commission's Exhibit H at 96. Similar religious references pervade the descriptions of other traditionally secular departments. *See, e.g., id.* at 142 (education), 176 (liberal studies), 196 (nursing), 207 (psychology).

Finally, unlike the colleges in *Roemer* and *Hunt*, faculty hiring and student admissions decisions do not appear to be made without regard to religion. Plaintiff's Human Rights Policy reserves the right "to give preference in employment of faculty and staff and admission of students to members of the [Sev-

enth-day Adventist Church]." Plaintiff's Exhibit B at 12. In fact, 36 out of 40 full-time faculty members are Seventh-day Adventists. Plaintiff's Exhibit C, ¶ 4. If part-time faculty members are included, 57% of the total faculty are Seventh-day Adventists. *Id.* Once faculty members are hired, they are evaluated in part based on whether they stress Christian values and philosophy in the classroom. *See* Commission's Exhibit N, App. I (statement of criteria for determining faculty excellence and forms for student evaluation of an instructor).

As to the student body, 80% of traditional students, and 20% of the evening students, are Seventh-day Adventists.[12] Commission's Exhibit W at 2. This fact, on its own, is not dispositive as the great majority of the students at each of the colleges in *Roemer* were Roman Catholic. *Roemer*, 426 U.S. at 757, 96 S.Ct. at 2350. However, Plaintiff's admission application asks applicants to state their religious affiliation. Commission's Exhibit I. Furthermore, Plaintiff states in its Bulletin that it "welcomes applications from all students whose principles and interests are in harmony with the policies and principles" expressed in the Bulletin. Commission's Exhibit H at 15. These "policies and principles," in turn, are interpreted in light of the Seventh-day Adventist Church's religious and moral teachings. *Id.* The Court must conclude that religion plays a role in faculty hiring and student admissions decisions.

Plaintiff's reliance on *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), is mis-

**11.** Plaintiff does not subscribe to the 1940 Statement of Principles on Academic Freedom of the American Association of University Professors. *Cf. Roemer,* 426 U.S. at 756, 96 S.Ct. at 2349–50. Instead, it claims that its policies are consistent with that statement. Plaintiff's Brief at 21. The 1940 AAUP statement allows some limitations on academic freedom because of religious or other aims of the institution. Plaintiff's Exhibit H. The AAUP 1970 Interpretive Comments disavow this limitation on academic freedom. *See* Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Commission's Reply"), Exhibit A at 6. Whether or not the 1970 comments alter the tenets of the 1940 statement need not be decided. The true issue before the Court is not whether Plaintiff's policies mimic the

AAUP statement, but rather whether Plaintiff fosters an environment of intellectual freedom among its faculty. Plaintiff's Policy Handbook calls into question its commitment to academic freedom.

**12.** Plaintiff does not argue that the evening program could be eligible for state funds even if the remainder of the school is pervasively sectarian. Nor could it, as the Supreme Court has made clear that if an institution is pervasively sectarian, even its secular components can receive no direct state funding. *Bowen v. Kendrick,* 487 U.S. 589, 610, 108 S.Ct. 2562, 2574–75, 101 L.Ed.2d 520 (1988).

placed. In *Witters*, Washington's statute provided state funds for vocational rehabilitation assistance for the blind. Washington refused to give aid to Witters because he was studying at a religious school to be a pastor, missionary, or youth director. The Court held that the Establishment Clause did not bar Witters from receiving state aid, even though he planned to use the funds for his religious education. *Id.* at 753, 96 S.Ct. at 2348.

Under the Washington statute, state funds were paid directly to the student, who then transmitted them to the educational institution of his choice.[13] *Witters*, 474 U.S. at 488, 106 S.Ct. at 751–52. The decision to give funds to an admittedly religious institution, therefore, was a private choice made by the individual, not a choice made by the state. *Id.* It thus made no difference whether the institution receiving the funds was pervasively sectarian. The situation was no different from a government employee's taking her paycheck and choosing to donate part or all of it to a church or other religious organization. *See Agostini v. Felton*, — U.S. —, —, 117 S.Ct. 1997, 2011, 138 L.Ed.2d 391 (1997) (discussing *Witters*). By contrast, in the instant case, the state itself is being asked to directly fund a pervasively sectarian institution.[14] Such funding is forbidden by the Establishment Clause.[15] *Rosenberger*, 515 U.S. at 841–42, 115 S.Ct. at 2523; *Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349.

In sum, the Court finds that Columbia Union College is a pervasively sectarian institution. The Commission, therefore, was barred by the Establishment Clause from providing funds under the Sellinger Program to Plaintiff.

### B. *Plaintiff's Free Speech and Association Claim*

■ In Count I, Plaintiff alleges that the Commission denied it funds under the Sellinger Program solely based on "the content or viewpoint of plaintiff's speech, communications, identity, activities, or affiliation." Complaint ¶ 30. Government discrimination against particular speech because of its content or viewpoint violates the First Amendment unless the state can show that its policy is necessary to serve a compelling state interest and is narrowly tailored to achieve that end. *See, e.g., Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S.Ct. 1722, 1728–29, 95 L.Ed.2d 209 (1987); *American Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir.1995).

■ Assuming for the purposes of discussion that the Commission's denial of funding to Plaintiff constituted content or viewpoint discrimination, the Commission's actions were nonetheless justified, as they were necessary to achieve its compelling interest in complying with the Establishment Clause. *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). Because the Commission's decision did nothing more than put into effect the Supreme Court's pronouncements that no state funds at all may be given directly to pervasively sectarian institutions, it was narrowly tai-

---

**13.** Even if Plaintiff is correct that, in actuality, the funds under the Washington statute were paid directly to the institution, the Supreme Court based its holding and reasoning on its understanding that such funds were instead paid to the individual, who was then free to use them at any school that he wished. *Witters*, 474 U.S. at 488, 106 S.Ct. at 751–52; *Agostini v. Felton*, — U.S. —, —, 117 S.Ct. 1997, 2011, 138 L.Ed.2d 391 (1997); *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 847–49, 115 S.Ct. 2510, 2526, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring).

**14.** The fact that the precise amount that an institution receives is based in part on the number of students enrolled in particular programs, *see* Md. Code Ann. Educ. § 17–104, does not make the Sellinger Program like the program in *Witters*.

In *Witters*, the decision to give any funds at all to the religious institution was made by a private individual. By contrast, in the instant case, while private choices may impact the ultimate amount that an institution receives, it would nonetheless be the state's decision to directly fund the pervasively sectarian institution in the first place.

**15.** Contrary to Plaintiff's assertions, *Agostini* and *Rosenberger* do not diminish the viability of the "pervasively sectarian" line of cases. In both cases, the Court took pains to note that no public funds were distributed directly to religious institutions. *Agostini*, — U.S. at —, 117 S.Ct. at 2013; *Rosenberger*, 515 U.S. at 841–43, 115 S.Ct. at 2523. The *Roemer* line of cases, therefore, were not implicated.

lored to achieve that end. *See American Life League,* 47 F.3d at 652.

Notwithstanding Plaintiff's protestations to the contrary, the Supreme Court's decision in *Rosenberger* does not alter this analysis. In *Rosenberger,* the Court of Appeals had held that the university's refusal to pay the printing costs of a student publication because of its Christian viewpoint, while generally paying the printing costs of other student publications, violated the publication's free speech rights. This violation, however, was justified by the university's need to comply with the Establishment Clause. The Supreme Court reversed, holding that the publication's free speech rights had been violated, but that there was no Establishment Clause justification. *Rosenberger,* 515 U.S. at 845–46, 115 S.Ct. at 2525. The Court did not hold, however, that compliance with the Establishment Clause is insufficient to justify a restriction on free speech. Rather, it held that, on the facts before, there was no such justification. *Id.* at 843–46, 115 S.Ct. at 2524–25.

In doing so, the Court reaffirmed the validity of the principle that direct money payments to pervasively sectarian institutions offend the Establishment Clause. *Id.* at 841–43, 115 S.Ct. at 2523. This principle was simply inapplicable as the Court was not then confronted with a situation in which the government was making direct money payments to an institution engaged in religious activity. *Id.* The Court chided the dissent and the Court of Appeals for failing to recognize "the undisputed fact that no public funds flow[ed] directly to [the publication's] coffers." *Id. Rosenberger* therefore does not undermine the conclusions that no state funds may be given directly to Plaintiff, a pervasively sectarian college, or that the Commission's need to comply with the Establishment Clause is a sufficiently compelling interest to justify an assumed violation of Plaintiff's rights to free speech and association. *See id.* at 851–52, 115 S.Ct. at 2528 (O'Connor, J., concurring) ("The Court's decision today therefore neither trumpets the supremacy of the neutrality principle nor signals the demise of the funding prohibition in Establishment Clause jurisprudence.").

Plaintiff also alleges in its Complaint that the Commission's guidelines and definitions for allocating Sellinger funds are unlawfully vague and overbroad. Complaint ¶ 32. Plaintiff appears to have abandoned these arguments, as not a single word in any of its materials in opposition to the Commission's motion or in support of its own cross-motion is devoted to them. In any event, Plaintiff's arguments that the Commission's policies are either overbroad or vague are plainly without merit. The Commission's policy of completely refusing to fund pervasively sectarian institutions is not overbroad. Rather, it is mandated by the Establishment Clause. The Establishment Clause simply does not allow the Commission to give any state funds to Plaintiff, not even funds earmarked for secular purposes.

Nor have the Commission's regulations and guidelines been shown to be unconstitutionally vague. Indeed, they are not even truly at issue. It is the Establishment Clause itself, and the Supreme Court's interpretations thereof, that mandated the Commission's decision. Any "vagueness" there may be lies not with the Commission's regulations and guidelines, but with the governing Establishment Clause jurisprudence.

Therefore, the Commission is entitled to summary judgment on Count I.

### C. *Plaintiff's Free Exercise of Religion Claim*

In Count II, Plaintiff alleges that the Commission impermissibly denied it funds under the Sellinger Program "based upon plaintiff's religious beliefs, character, affiliation, speech, and association" in violation of the Free Exercise Clause of the First Amendment. Complaint ¶¶ 35–36.

A neutral, generally applicable government action does not offend the Free Exercise Clause, even if it has an incidental effect on religious practice. *Goodall by Goodall v. Stafford County Sch. Bd.,* 60 F.3d 168, 170 (4th Cir.1995) ("*Goodall II* "), *citing Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 878–79, 110 S.Ct. 1595, 1599–1600, 108 L.Ed.2d 876 (1990). If a government action is not neutral and gener-

ally applicable, and thus imposes a substantial burden on religious practice, it violates the Free Exercise Clause unless the state can show that it is justified by a compelling interest and narrowly tailored to achieve that interest. *Goodall II,* 60 F.3d at 171–73; *Goodall by Goodall v. Stafford County Sch. Bd.,* 930 F.2d 363, 369–70 (4th Cir.1991) ("*Goodall I* ").

Assuming *arguendo* that the Commission's decision should be subject to strict scrutiny, Plaintiff still cannot prevail on its Free Exercise claim. The Commission's complete denial of Plaintiff's application for Sellinger funds was necessary to comply with the Establishment Clause and narrowly tailored to achieve that interest. It is well-settled in the Fourth Circuit that the avoidance of a violation of the Establishment Clause is a compelling state interest justifying an alleged burden on the free exercise of religion. *Goodall I,* 930 F.2d at 370; *Smith v. County of Albemarle,* 895 F.2d 953, 959–60 (4th Cir.1990). Therefore, the Commission is entitled to summary judgment on Count II.

### D. *Plaintiff's Equal Protection Claim*

In Count III, Plaintiff asserts that the Commission's actions violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment by treating Plaintiff differently from other similar situated colleges and universities on the basis of its religious beliefs. Complaint ¶¶ 42–44.

If the Commission's actions created a suspect classification or infringed on a fundamental right, they would be subject to strict scrutiny. *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–day Saints v. Amos,* 483 U.S. 327, 338–39, 107 S.Ct. 2862, 2869–70, 97 L.Ed.2d 273 (1987). On the other hand, if neither a suspect class nor a fundamental right are involved, the Commission's actions need only be rationally related to a legitimate state interest. *Roller v. Gunn,* 107 F.3d 227, 233 (4th Cir.1997).

The Court will assume for the moment that Plaintiff and the colleges that received Sellinger funds are similarly situated. Further, the Court will assume that the Commission's actions created a suspect classification or burdened a fundamental right, thereby triggering strict scrutiny. Plaintiff's Equal Protection claim fails nonetheless. As noted above, the Commission's actions were justified by its compelling interest in complying with the Establishment Clause. *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). Conversely, if strict scrutiny is inappropriate, the Commission's denial of Plaintiff's application for Sellinger funds is certainly rationally related to its legitimate interest in compliance with the mandate of the Establishment Clause.

Therefore, the Commission is entitled to summary judgment on Count III.

### IV. *CONCLUSION*

For the foregoing reasons Defendants' Motion for Summary Judgment is GRANTED and Columbia Union College's Cross–Motion for Summary Judgment is DENIED. Accordingly, Judgment shall be entered for Defendants by separate Order.