Dear Ms. McKennon:
As counsel to the Maryland Health and Higher Educational Facilities Authority ("MHHEFA"), you have asked whether we concur with your assessment of the extent to which the Establishment Clause of theFirst Amendment of the United States Constitution restricts MHHEFA's activities. In particular, you have concluded that MHHEFA may issue its revenue bonds a method of pass-through or conduit financing on behalf of a religiously-affiliated elementary or secondary school without inquiring into whether the school is "pervasively sectarian." You accompanied your request with a well-researched memorandum analyzing recent opinions of the Supreme Court and the United States Court of Appeals for the Fourth Circuit that construe the Establishment Clause in the context of direct grants to private schools.
In our opinion, the "pervasively sectarian" criterion has diminished in significance in recent decisions concerning the constitutionality of private school aid, and indeed, appears irrelevant to the outcome of recent cases involving revenue bonds. However, it has not been formally discarded as part of Establishment Clause analysis and, thus, there is some risk that a court could hold that the issuance of bonds on behalf of a school that could be characterized as "pervasively sectarian" violates the Establishment Clause. However, that risk is likely to be minimal if MHHEFA continues to require institutions to covenant not to use bond proceeds for religious activities and takes good faith steps to ensure compliance with that agreement.
 I Background
The General Assembly created MHHEFA in 1970 to assist nonprofit hospitals and institutions of higher education in obtaining funding for capital projects through the issuance of revenue bonds. Chapter 408, Laws of Maryland 1970, codified at Annotated Code of Maryland, Article 43C. Bonds issued by MHHEFA do not constitute a debt or liability of the State or any of its agencies. Nor may MHHEFA pledge the faith and credit of the State. Rather, debt service is paid from the revenue of those institutions that receive assistance under the program.
In 1998, the General Assembly extended MHHEFA's authority to assist "noncollegiate educational institutions" i.e., elementary and secondary schools, including private institutions. Chapter 696, Laws of Maryland 1998. This new authorization encompassed religiously-affiliated elementary and secondary schools. See Article 43C, § 3(f)(2)(ii) (defining "noncollegiate educational institution" to include "an institution operated by a bona fide church organization").
In a bill review letter concerning the 1998 amendment, the Attorney General advised the Governor that the legislation was constitutional in that the Establishment Clause does not prevent the State from providing financial assistance to educational institutions operated by religious organizations. Letter of Attorney General J. Joseph Curran, Jr. to Governor Parris N. Glendening (May 15, 1998). However, the Attorney General cautioned that the Establishment Clause forbade public funding of "pervasively sectarian" institutions. Id. at pp. 2-3. The Attorney General relied on two cases on the constitutionality of a Maryland grant program for private schools: Roemer v. Board of Public Works, 426 U.S. 736
(1976), a leading Establishment Clause decision, and Columbia Union College v. Clarke, 988 F. Supp. 897 (D.Md. 1997). The Attorney General concluded that the conduit financing available through MHHEFA could not be provided to institutions that are pervasively sectarian. Id. The bill review letter noted that the classification of a school was a case-by-case determination that could be addressed by MHHEFA at an administrative level. Id. at p. 3.
MHHEFA subsequently developed administrative procedures to gauge whether a particular institution is pervasively sectarian. Among those procedures is a requirement that the institution complete a detailed questionnaire concerning its religious affiliation, the role of religion in its curriculum and school activities, the use of religious criteria to select students and faculty, and other information. At the request of MHHEFA, this Office reviewed the questionnaire and other procedures and concluded that they would permit MHHEFA to make the case-by-case determinations mentioned in the bill review letter. Letter of Assistant Attorney General Robert N. McDonald to Elizabeth A. McKennon (December 1, 1998). We understand that MHHEFA has employed those procedures in determining whether to provide assistance to religiously-affiliated elementary and secondary schools.
 II Analysis
Recent decisions of the Supreme Court and the Fourth Circuit cast significant doubt on the continuing vitality of the "pervasively sectarian" criterion in Establishment Clause analysis.[1] Other recent appellate decisions indicate that, whatever the role of that standard in the analysis of direct aid to private schools, it is no longer a significant factor in the validity of conduit financing. Thus, the question arises whether an agency like MHHEFA must undertake that inquiry in order to comply with the Establishment Clause.
A. Tax Exempt Revenue Bonds and Pervasively Sectarian Institutions
1. Hunt v. McNair: The Supreme Court Makes the Inquiry in a Case Involving Revenue Bonds
Three decades ago, the Supreme Court considered the extent to which the Establishment Clause restricted the issuance of revenue bonds by a government agency on behalf of a religiously-affiliated university. Hunt v. McNair, 413 U.S. 734 (1973). That case involved a proposed use of South Carolina revenue bonds for the benefit of a Baptist-controlled college. The Court reiterated the three-part test for application of the Establishment Clause that it had announced in Lemon v. Kurtzman,403 U.S. 602 (1971). That test looked to whether a statute or policy: (1) has a secular purpose; (2) has a primary effect of advancing or inhibiting religion; or (3) creates an excessive entanglement between government and religion.
The Court introduced the "pervasively sectarian" criterion as part of the analysis under the effect prong of the Lemon test.[2] The Court explained the rationale for that inquiry:
 Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.
 413 U.S. at 743. Another factor to be considered under the effect prong was whether the aid would be directed to a religious function. These two factors were related. The underlying logic of the pervasively sectarian standard, as articulated in Hunt, is that it is impossible for the government to direct its aid solely to secular functions when a school is so sectarian that its religious mission infuses any otherwise secular activity. See Note, Revenue Bonds and Religious Education: The Constitutionality of Conduit Financing Involving Pervasively Sectarian Institutions, 100 Mich. L.Rev. 1108, 1113 (2002).
In Hunt, the Court found that the institution in question was not pervasively sectarian; in addition, the agreement between the college and the bonding authority forbade religious use of the project financed with bond proceeds and allowed state inspections to enforce that provision.413 U.S. at 744-45. In the Court's view, neither the inspections allowed under the agreement to ensure non-religious use nor the possibility that the state agency would foreclose on the mortgage threatened excessive entanglement — the third prong of the Lemon test. Id. at 745-49.
Thus, under the holding in Hunt v. McNair, when a religiously-affiliated school sought conduit financing through a government agency, the analysis under the Establishment Clause depended in part on whether the school could be characterized as "pervasively sectarian." A plurality opinion of the Court later elaborated factors to be considered to assess whether a school is pervasively sectarian in Roemer v. Board of Public Works, 426 U.S. 736 (1976), a case concerning a Maryland grant program for private schools. The plurality opinion in Roemer reiterated that "no state aid at all [may] go to institutions that are so `pervasively sectarian' that secular activities cannot be separated from sectarian ones." Id. at 755. MHHEFA has incorporated the factors outlined in Roemer in its current administrative procedures.
In a footnote in Hunt, the Court adverted to another possible basis for upholding the issuance of revenue bonds on behalf of religiously- affiliated schools a rationale requiring no inquiry into whether the schools are pervasively sectarian. The Court noted the limited nature of the aid provided to the school:
 The "state aid" involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable terms than would otherwise be available. . . .
413 U.S. at 745 n. 7. Thus, this state aid was in some ways analogous to a tax exemption for religious property. But the Court explicitly declined to decide whether tax-exempt conduit financing came within a previous decision upholding a tax exemption for religious property. Id. (citing Walz v. Tax Commission, 397 U.S. 664 (1970)).
2. Mitchell v. Helms: Use of the Pervasively Sectarian Standard as Part of Establishment Clause Analysis is Questioned in the Supreme Court
The continuing vitality of the "pervasively sectarian" criterion as part of Establishment Clause analysis was recently discussed at some length in a plurality opinion in Mitchell v. Helms, 530 U.S. 793 (2000), a case that did not involve conduit financing, but rather direct aid to religiously-affiliated schools. As outlined below, courts and commentators have speculated that Mitchell signals the end of the "pervasively sectarian" standard, particularly in the context of conduit financing for religiously-affiliated schools. See Note, Revenue Bonds and Religious Education: The Constitutionality of Conduit Financing Involving Pervasively Sectarian Institutions, 100 Mich. L.Rev. 1108 (2002); Lark, "Pervasively Sectarian" Institutions May Now Qualify for Tax-Exempt Financing, 12 J. Tax'n Exempt Orgs. 173 (2001).
In Mitchell, a federal program provided funds for educational materials and equipment to public and private elementary and secondary schools via state and local education agencies. A lower federal court concluded that providing this aid to religiously-affiliated schools offended the Establishment Clause and that the law was therefore unconstitutional. The Supreme Court reversed in a 6-3 decision. No opinion garnered a majority of the Court. Rather, four justices favoring reversal joined in a plurality opinion by Justice Thomas; and Justice O'Connor wrote a concurring opinion joined by Justice Breyer. Three justices joined in a dissenting opinion by Justice Souter.
The plurality opinion recounted the history of the three-part Lemon test used to evaluate state aid to private schools, including modification of the test in Agostini v. Felton, 521 U.S. 203 (1997). In Agostini, the Court had recast the Lemon analysis as a two-part test focused on the purpose and effect of the program. The third (entanglement) prong of the Lemon test became one of several factors to be considered in assessing the effect of a statute whether the statute results in governmental indoctrination, whether it defines recipients by reference to religion, and whether it creates an excessive entanglement.530 U.S. at 807-8.
To distinguish between indoctrination that is attributable to the state and indoctrination that is not, the Mitchell plurality opinion looked to the "principle of neutrality":
 If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government.
 530 U.S. at 809. The opinion also placed emphasis on a related factor important to the Court's past decisions whether any governmental aid that goes to a religious institution does so only as a result of independent private choices of individuals. Id. at 810.
The plurality indicated that the same principles should apply regardless of whether the aid is direct or indirect in nature.530 U.S. at 815-19. In addition, it considered the potential divertibility of aid to religious purposes irrelevant, so long as the aid itself is not impermissibly religious in content. Id. at 819-25.
Applying these principles to the program at issue, the plurality opinion concluded that it passed muster under the Establishment Clause.530 U.S. at 829-35.
The plurality opinion in Mitchell did not apply the "pervasively sectarian"criterion as part of its own analysis. Rather, the plurality discussed the standard in response to a contention by the dissenting opinion that aid to "pervasively sectarian" schools would offend the Establishment Clause. The plurality opinion clearly rejected that criterion as a part of Establishment Clause analysis, stating that "[t]his doctrine, born of bigotry, should be buried now."530 U.S. at 829. Thus, four justices of the Supreme Court would completely abandon inquiry into whether a recipient of government aid is "pervasively sectarian."
The plurality opinion advanced several reasons for not inquiring whether an institution is "pervasively sectarian": recent Court decisions involving aid to religiously-affiliated schools had not turned on that criterion; the religious nature of a recipient of government aid should not matter so long as the recipient adequately furthers the government's secular purpose; a governmental inquiry into a recipient's religious views can be offensive and is at odds with other Court decisions prohibiting discrimination based upon a person's religious status or sincerity; opposition to aid to religiously-affiliated schools could be traced to religious prejudice that dominated in the 1870's. Id. at 826-29.
Justice O'Connor, joined by Justice Breyer, concurred in the judgment upholding the aid program involved in Mitchell, but distanced herself from the "rule of unprecedented breadth" articulated by the plurality opinion for analysis of Establishment Clause issues. 530 U.S. at 837. Rather, she simply applied the Lemon test, as modified in Agostini, to uphold the statute. Id. at 844-49.
Justice O'Connor identified two basic points of difference with the plurality: (1) whether neutrality is the single most important factor in assessing a government aid program under the Establishment Clause, and (2) whether diversion of government aid to religious indoctrination is permissible. With respect to the first point, she considered the neutrality of a program one of several important factors.530 U.S. at 837-40. With respect to the second point, she argued that a school's use of direct government aid for religious indoctrination is constitutionally impermissible. Id. at 840-44.
Without directly addressing the "pervasively sectarian" criterion, Justice O'Connor indicated her belief that it rests on a faulty assumption:
 . . .I would adhere to the rule that we have applied in the context of textbook lending programs: To establish a First Amendment violation, plaintiffs must prove that the aid in question actually is, or has been, used for religious purposes. . . . I would now hold that . . . [recent] cases . . . have undermined the assumptions underlying [prior cases] . . . and also stood for or at least strongly pointed to the broader proposition that such presumptions of religious indoctrination are normally inappropriate when evaluating neutral school aid programs under the Establishment Clause.
 530 U.S. at 857-58. Rather than presuming that aid to a pervasively sectarian school would result in religious indoctrination, Justice O'Connor would require evidence of diversion of aid to that purpose. Id.
In discussing whether aid in the Mitchell case had been diverted to religious inculcation, Justice O'Connor rejected the notion that "the government must have a failsafe mechanism capable of detecting any instance of diversion." Id. at 861. She noted that the relevant statutes limited the aid to secular purposes and a prohibited against its use for religious worship or instruction. Moreover, recipients were required to submit signed assurances that the aid would be used only for secular, neutral, and non-ideological purposes. In addition, states retained the power to cut off aid to any school that breached those assurances. Finally, state authorities conducted periodic monitoring, including site visits, to ensure compliance. Id. at 861-63. In sum, Justice O'Connor was willing to indulge a presumption that school officials would act in good faith in carrying out their assurances and making reports to the state. Id. at 864.
Finally, it is notable that the Mitchell decision formally overruled two of the Court's prior decisions of the same vintage as Hunt v. McNair, in which the pervasively sectarian standard was a deciding factor. In particular, both the plurality and Justice O'Connor agreed that those decisions, which involved direct state aid to private elementary and secondary schools in the form of instructional materials and equipment, were no longer good law. 530 U.S. at 808, 835, 837,850-53, overruling Meek v. Pittenger, 421 U.S. 349 (1975), and Wolman v. Walker, 433 U.S. 229 (1977). Thus, it is clear that the pervasively sectarian standard is no longer a decisive factor in determining the constitutionality of direct aid to religiously-affiliated elementary and secondary schools.
3. Columbia Union College v. Oliver: The Fourth Circuit Considers the Relevance of the Pervasively Sectarian Standard after Mitchell
The Attorney General's 1998 bill review letter concerning the MHHEFA enabling law relied in part on a recent decision in which the federal district court in Maryland had upheld a denial of assistance on the ground that the applicant private college was pervasively sectarian. Subsequently, that decision was vacated by the Fourth Circuit, with instructions to the district court to conduct a "fact-intensive" inquiry into whether the school in question was pervasively sectarian. Columbia Union College v. Clarke, 159 F.3d 151 (4th Cir. 1998), cert. denied,527 U.S. 1013 (1999).
On remand, the district court conducted a trial, after which it concluded that the school was not pervasively sectarian. The Fourth Circuit affirmed that decision. 254 F.3d 496 (4th Cir. 2001). However, the Supreme Court's intervening decision in Mitchell significantly affected the court's treatment of that issue.
Two members of the three-judge panel would have found the applicant school eligible for a State grant without engaging in an analysis of whether the school was pervasively sectarian.[3] The court stated that "the Mitchell case has significantly altered the Establishment Clause landscape by addressing the circumstances under which sectarian schools may be eligible for government aid." 254 F.3d at 501. After reviewing the plurality and concurring opinions in Mitchell, the court identified Justice O'Connor's opinion as "controlling" and derived "three fundamental guideposts" from it: (1) neutrality of aid criteria is an important factor; (2) actual diversion of government aid to religious purposes is prohibited; (3) the pervasively sectarian criterion involves a presumption of religious indoctrination that is "normally inappropriate" when evaluating a neutral school aid program. 254 F.3d at 504.
Applying the modified Lemon test, the Fourth Circuit found no dispute that the Maryland aid program had a secular purpose. 254 F.3d at 504. Second, the court concluded that the aid did not have the effect of advancing religion. It noted that the aid program was based upon indisputably neutral criteria. There had been no diversion of aid to religious purposes, as the applicant had not yet received any aid. Id. at 505-6. Moreover, in accordance with the statute creating the program, the school had pledged that the funds would not be used for sectarian purposes. Id. at 506. In addition, the school would be required to provide annual pre and post-expenditure affidavits documenting the institution's actual and intended use of funds. Id. The court concluded that these safeguards were adequate to prevent diversion of State funds to sectarian use. Id.
Finally, the court observed that aid to religiously-affiliated colleges and universities, such as Columbia Union, raised less concern than aid to elementary and secondary schools. Id. at 507.
Although the Fourth Circuit believed that the Supreme Court would approve the aid in the case before it without resort to an analysis of whether the school was pervasively sectarian, it also reviewed the district court's finding that the school was not pervasively sectarian. The court held that the finding was not clearly erroneous, thus upholding the district court on an alternative basis. Id. at 508-10.
Even though the program at issue in Columbia Union involved direct grants rather than revenue bonds, the decision is instructive because it was issued by the federal court of appeals with jurisdiction over Maryland. Two courts in other jurisdictions have addressed the constitutionality of revenue bonds for pervasively sectarian institutions since Mitchell.
4. Post-Mitchell Cases Involving Revenue Bonds for Sectarian Institutions
In the wake of Mitchell, two appellate courts have upheld the issuance of revenue bonds for the benefit of schools found to be pervasively sectarian. While neither court completely discarded the pervasively sectarian standard, it appeared to be largely irrelevant to the outcome in the cases.
a. Virginia College Building Authority v. Lynn: Revenue Bonds as "Private" Aid
Shortly after the Mitchell decision, the Virginia Supreme Court upheld use of a state revenue bond program by a pervasively sectarian college. Virginia College Building Authority v. Lynn, 260 Va. 608, 538 S.E.2d 682
(2000). The Virginia court employed the "pervasively sectarian" standard, not as a litmus test for whether a school is eligible for aid, but as a threshold inquiry that triggers further analysis. In that case, a state trial court had held that a religiously-affiliated college created under the auspices of the Christian Broadcasting Network was ineligible to participate in a state revenue bond program because it was pervasively sectarian and because its primary purpose was religious training.
On appeal, the Virginia Supreme Court agreed that the school was pervasively sectarian, but decided, in light of Mitchell, to reconsider a prior decision in which it had held that such a school was ineligible to participate in a Virginia industrial bond program. 538 S.E.2d at 689-91. The Virginia court stated that the Mitchell "plurality's obituary for analysis of pervasive sectarianism may be premature." However, the court reviewed a number of Supreme Court decisions approving various types of aid to such schools, and concluded that both the nature of the aid and the nature of the institution receiving the aid must be considered under the Establishment Clause. Id. at 693-95. The court concluded that the appropriate approach was to determine first whether the institution is pervasively sectarian and, if so, whether the particular type of assistance is permitted under the Establishment Clause. Id. at 696-97.
Using this approach in the case before it, the Virginia Supreme Court concluded that the college was pervasively sectarian.538 S.E.2d at 697-98. However, given the nature of the aid, the court found that the Establishment Clause did not disqualify the school from the program. Citing the footnote in Hunt v. McNair that described the limited nature of conduit financing, the Virginia court characterized the bond proceeds as "the funds of private investors . . . not governmental aid." Id. at 698. "The nature of this aid is properly defined as the granting of tax exempt status to bonds which has the incidental result of permitting a qualifying institution to borrow funds at an interest rate lower than conventional private financing." Id. As no government funds flowed to the school, it could not be said that government funds were diverted for religious indoctrination. Rather, the school received funds because of the "genuinely independent choices of investors," and this result could not be attributed to state decisionmaking. Id. at 698-99. Thus, the court concluded, the participation of a pervasively sectarian school in the program did not violate the Establishment Clause.
b. Steele v. Industrial Development Board: Revenue Bonds as Neutral, Indirect Aid
This past year, a three-judge panel of the Sixth Circuit, in a 2-1 decision, upheld the issuance of revenue bonds for the benefit of a university characterized as indisputably pervasively sectarian. Steele v. Industrial Development Board, 301 F.3d 401 (6th Cir. 2002), cert. denied, 71 U.S.L.W. 3455 (February 24, 2003). That case concerned the issuance of tax-exempt revenue bonds under a Tennessee law for the benefit of Lipscomb University, which is affiliated with the Churches of Christ. The district court found the issuance of the bonds for Lipscomb unconstitutional, in part because the university was pervasively sectarian.
On appeal, the Sixth Circuit observed that constitutionality of the issuance of tax-exempt revenue bonds for the benefit of a pervasively sectarian institution had not been addressed by the Supreme Court or the other circuit courts of appeal. 301 F.3d at 406 nn. 3-4. The court stated that "[t]he vitality of the pervasively sectarian test is questionable" in light of recent Supreme Court decisions, including Mitchell. Id. at 408. Nevertheless, the court stated that "[i]t is for the Supreme Court, not this Court, to jettison the pervasively sectarian test, which it has not done." Id. at 409.
Adopting the theory suggested in the footnote in Hunt v. McNair, the court characterized "pass-through or conduit financing" as a form of indirect aid analogous to a religiously neutral tax exemption for charitable organizations. 301 F.3d at 410-13. The court noted that an institution seeking a tax-exempt bond must arrange for the financing by locating exclusively private lenders; a purchaser of a bond has recourse only against the borrower and not the government agency; and no government funds are involved in the transaction. Id. at 413. The impact of conduit financing on government funds is limited to the potential loss of revenue attributable to the tax exemption. Id. Observing that industrial revenue bonds are issued to a wide variety of businesses, schools, and other organizations, the court noted that religious organizations are not barred from receiving general government benefits. Id. at 414-15. The court reasoned that such bonds serve a secular interest in promoting economic and educational development and asserted that they neither advance nor inhibit religion. Id. at 415-16. The court noted that the loan agreement under which the university received the bond proceeds prohibited the use of bond-financed facilities for religious purposes. 301 F.3d at 416.
The court summarized its analysis:
 In sum, the nature of the institution is not the relevant inquiry in the special type of aid at issue in this appeal. The nature of the aid conferred by the tax free revenue bonds is not direct aid. Instead, it is analogous to an indirect financial benefit conferred by a religiously neutral tax or charitable deduction . . . . The funding vehicle is available on a neutral basis. No government funds will be expended. Nor does any holder of a bond have recourse against the [government agency] in the event of nonpayment. The benefit to be obtained by [the religious school] is the same provided to private companies which create identical economic opportunities. The conduit financing advances a clear governmental, secular interest in promoting economic opportunity. Finally, the revenue bond program does not present the perception of government endorsement of religion.
Id. at 416-17. Thus, given the nature of conduit financing, the court held that the provision of such aid to a school like Lipscomb did not violate the Establishment Clause.[4]
The dissenting judge would have held that issuance of the revenue bonds is a form of direct government aid that, when bestowed on a pervasively sectarian university, violates the Establishment Clause. Id. at 417-41.
B. Application to MHHEFA
The recent decisions of the Supreme Court and the Fourth Circuit indicate that the "pervasively sectarian" criterion is not the decisive factor that it once was in Establishment Clause analysis. In Mitchell, neither the four-justice plurality nor the two-justice concurring opinion applied that criterion; indeed, the plurality opinion labeled its application "offensive." In Columbia Union, two judges hailed the demise of the criterion and the third judge appeared to acknowledge that it was not likely to be a factor in Establishment Clause analysis in the future.
It seems incongruous to insist that MHHEFA conduct a detailed inquiry into whether a school is pervasively sectarian to be eligible for conduit financing when six justices of the Supreme Court upheld a direct aid program to religiously-affiliated elementary and secondary schools without analyzing whether the schools were pervasively sectarian. Moreover, the two post-Mitchell appellate decisions concerning conduit financing approved the use of revenue bonds for schools that had been found to be pervasively sectarian. Those decisions focused on the nature of the aid rather than the character of the school.
On the other hand, a majority of the Supreme Court has not formally cast aside the "pervasively sectarian" standard. Apparently for that reason, the Fourth Circuit applied that standard in an alternative holding in Columbia Union and one member of that panel would have confined the court's review to that issue. In addition, in approving revenue bonds for a pervasively sectarian university, the Virginia Supreme Court included an inquiry into the sectarian nature of the school as the first step in its Establishment Clause analysis.
Finally, the Supreme Court has instructed, in one of its leading Establishment Clause cases, that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the [Supreme] Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237
(1997). Thus, it might be argued that Hunt v. McNair, which proposed an inquiry into the sectarian nature of a school, still governs the assessment of the use of revenue bonds.[5]
The extent to which the courts still apply the pervasively sectarian criterion may depend on the level of the school involved. In the past, that criterion was deemed particularly important with respect to aid to elementary and secondary schools. See Columbia Union, 254 F.3d at 507. Although the divided decision in Mitchell concerned a program directed to elementary and secondary schools, Columbia Union and the two post-Mitchell decisions concerning revenue bonds all involved post-secondary institutions. It is conceivable that a court considering a challenge to conduit financing for a pervasively sectarian elementary school might be less inclined to anticipate that the Mitchell plurality will prevail.[6]
It may be that the most appropriate reading of Mitchell is that a majority of the Supreme Court has retained the "pervasively sectarian" standard, not as a presumptive disqualification for aid in the form of conduit financing, but rather as part of an inquiry into whether actual diversion of aid to religious purposes has occurred. See Note, Revenue Bonds and Religious Education: The Constitutionality of Conduit Financing Involving Pervasively Sectarian Institutions, 100 Mich. L.Rev. at 1124 n. 118, 1129 n. 149. In that regard, it is notable that the concurring and dissenting opinions in Mitchell which together constituted a majority of five members of the Court both indicated that diversion of government aid to religious purposes would violate the Establishment Clause. See Mitchell, 530 U.S. at 861-64 (O'Connor, J., concurring); 530 U.S. at 903-10 (Souter, J., dissenting).
Thus, advance assurances that aid will not be diverted, accompanied by a good faith monitoring program, appear key to maintaining the program within constitutional constraints. We understand that, as part of the loan or lease agreement under which MHHEFA makes bond proceeds available to a school, the institution must agree that:
 No part of the project [financed with bond proceeds] shall be used for sectarian religious instruction or as a place of sectarian religious worship or in connection with any part of the program of a school or department of divinity for any religious denomination.
If MHHEFA has reason to believe that a facility to be constructed with bond proceeds may be devoted to sectarian religious instruction or worship, further inquiry will be warranted into the proposed use of the funds and the ability of the applicant to enter into this covenant in good faith. If MHHEFA is satisfied that the applicant can enter into the agreement in good faith and issues revenue bonds, it should ensure that the applicant abides by its promise. In that regard, we understand that each agreement grants MHHEFA a right to inspect a project to monitor compliance with various covenants, including the covenant against use for sectarian religious purposes. Documentation of these assurances and of follow-up monitoring will be more important than a detailed preliminary inquiry into the sectarian nature of the institution if MHHEFA is called upon to defend its issuance of revenue bonds on behalf of a religiously-affiliated school.
 III Conclusion
In our opinion, the "pervasively sectarian" criterion has diminished in significance in recent decisions concerning the constitutionality of private school aid, although it has not been formally discarded as part of Establishment Clause analysis. While there is some possibility that a court would still employ that criterion in reviewing whether the issuance of revenue bonds violates the Establishment Clause, it appears unlikely that a court would disqualify even a pervasively sectarian school from conduit financing. Thus, it would not be unreasonable for MHHEFA to truncate or eliminate the preliminary detailed administrative inquiry into the sectarian nature of an applicant. Any risk that a court would invalidate the use of revenue bonds is likely to be minimal if MHHEFA continues to require institutions to covenant not to use bond proceeds for religious activities and takes good faith steps to ensure compliance with that agreement.
Very truly yours,
J. Joseph Curran, Jr.
 Attorney General
Robert N. McDonald
 Chief Counsel
Opinions and Advice
[1] This opinion focuses on the requirements of the federal Constitution, as the Maryland Constitution does not prohibit direct State grants to sectarian educational institutions. Horace Mann League v. Board of Public Works, 242 Md. 645, 684-90, 220 A.2d 51 (1966); cf. Truitt v. Board of Public Works, 243 Md. 375, 400, 221 A.2d 370 (1966) (loans to sectarian hospitals).
[2] The Court readily found that the authorization of revenue bonds for educational institutions had a secular purpose. 413 U.S. at 741-42.
[3] While conceding that the opinions in Mitchell signaled the Supreme Court's retreat from the use of the pervasively sectarian criterion, one judge noted that, because the Supreme Court's decision in Roemer involved the same Maryland program at issue in Columbia Union, that case remained a directly controlling precedent. 254 F.3d at 510-11 (Motz, J., concurring). She therefore limited her concurrence to affirming of the district court's finding that the school was not pervasively sectarian.
[4] The decision was presaged in a prior Sixth Circuit case. Johnson v. Economic Development Corp., 241 F.3d 501 (6th Cir. 2001). That case involved an Establishment Clause challenge to the use of tax-exempt revenue bonds under Michigan law to finance a construction project at a parochial elementary and secondary school. The court found that the program satisfied the two prongs of a modified Lemon test, noting that the proceeds of the bonds did not support religious aspects of the school.241 F.3d at 512-14. The court suggested that the access to revenue bond financing would not be considered "direct" aid for Establishment Clause purposes. 241 F.3d at 511 n. 3. In examining the question whether provision of such financing would result in excessive entanglement of government and religion, the court found that the school was not pervasively sectarian. Id. at 516-17. One of the three judges on the Johnson panel cited the plurality decision in Mitchell and predicted that the Supreme Court would hold that the Establishment Clause does not bar conduit financing, such as revenue bonds, for pervasively sectarian schools, although he found it unnecessary to reach that question in the Johnson case.
[5] A recent opinion of the Attorney General of Arkansas addressed the question whether the proceeds of revenue bonds could be earmarked for sectarian or parochial schools. Ark. Op. Atty. Gen. 2002-137,2002 WL 2005932 (August 30, 2002). The Arkansas Attorney General reviewed at length the Mitchell opinions and the Sixth Circuit decision in Steele, but was unable to arrive at a firm conclusion whether such bonds would be permissible under the Establishment Clause. Id. at *8.
[6] Although the two post-Mitchell Sixth Circuit decisions concerning revenue bonds may not be completely reconcilable, it is notable that the court discounted the pervasively sectarian criterion in a case involving a university (Steele), but retained it as a factor in a case involving an elementary and secondary school (Johnson), even though it found that the school in the latter case was not pervasively sectarian. *Page 72